# In the
# United States Court of Appeals
## For the Seventh Circuit
———————

No. 02-3741

DANIEL CROWLEY,

Plaintiff-Appellant,

v.

DONALD MCKINNEY and BERWYN SOUTH
SCHOOL DISTRICT #100,

Defendants-Appellees.

———————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 02 C 2091—**Charles P. Kocoras**, *Chief Judge.*

———————

ARGUED NOVEMBER 10, 2004—DECIDED MARCH 11, 2005

———————

Before POSNER, WOOD, and EVANS, *Circuit Judges.*

POSNER, *Circuit Judge.* The district court dismissed, for failure to state a claim, Daniel Crowley's civil rights suit (42 U.S.C. § 1983) against the principal of his children's school, and the school district itself. His appeal presents questions mainly about the right of a noncustodial divorced parent to participate in his children's education. Our only source of facts is the complaint itself plus the divorce decree, of which we take judicial notice. The summary that follows assumes the truth of the plaintiff's allegations, but of course without vouching for them.

The children, a boy and a girl, were 8 and 7 when the complaint was filed in 2002. The parents had been divorced four years earlier. A marital settlement agreement incorporated in the divorce decree provides that Mrs. Crowley "shall have the sole care, custody, control and education of the minor children." But this is qualified by a later provision that the parties "shall have joint and equal rights of access to records that are maintained by third parties, including . . . their education . . . records. Each of them shall direct the school . . . to send them each duplicate notices of all records, events, and issues concerning the children, and neither of them shall be responsible to inform the other of any such records, events or issues if such direct notice has been or can be provided for. They shall cooperate to ensure that the children and other authorities do provide the requested notices and information to both parents regarding their progress and activities . . . . Each party shall direct the children's school authorities to promptly advise each of them of the children's grades and progress in school and of all school meetings, functions and activities that are open to attendance by parents. They shall cooperate to ensure that such dual notice is in place."

The children attend the Hiawatha Elementary School, a public school in a Chicago suburb. Defendant McKinney is the school's principal and is directly responsible for all the acts of which the plaintiff complains. The superintendent of the school district (William Jordan, not named as a defendant), the policymaker for the district, knew about McKinney's acts but did nothing to stop them.

Crowley had long been critical of the "leadership and direction" of the school by McKinney and Jordan, and had expressed these criticisms at public meetings. He had also complained directly to them about his son's being bullied by other children and about the school's "failure to ade-

quately provide Plaintiff with notices, records, correspondence and other documents" that custodial parents receive. As a result of that failure, Crowley "must rely on his children telling him about matters such as upcoming school events or injuries suffered at school, and only hears about incidents such as a gun being brought to Hiawatha School through third parties." In letters to McKinney, Crowley "asked for increased supervision and response to bullying of his children, and asked that he receive all of the documents received by custodial parents with children attending Hiawatha School." He even "provided the teachers and McKinney each with 100 self-addressed envelopes, to facilitate his receipt of all correspondence." All to no avail: "Plaintiff's requests have never been granted, and Plaintiff still does not receive all of the items to which he is entitled." After his son was again beaten up on the school playground, Crowley went to observe his son during recess and was told that he (that is, Crowley) was not allowed on the playground. He volunteered to be a playground monitor, but McKinney turned him down. Once, because his son had been feeling ill, Crowley called the school to ask whether his son was at school that day, and the person who answered the phone refused to tell him. The school also forbade him to attend a book fair held at the school on Hiawatha School Day.

These incidents and others narrated in the complaint caused Crowley emotional distress for which he seeks damages. No injunctive relief is sought, which is surprising and casts some doubt on the bona fides of the suit, since we were told at argument without contradiction that Crowley's relations with McKinney and Jordan have not improved. There is nothing in the complaint about the reaction, if any, of Mrs. Crowley to her husband's efforts to obtain school records of their children or otherwise participate in school activities.

Crowley contends that the defendants' conduct deprives him of a federal constitutional right to participate in his children's education, denies him equal protection of the laws by arbitrarily distinguishing between custodial and noncustodial parents, also denies him equal protection by treating him worse than similarly situated parents because of McKinney's personal hostility to him, infringes his freedom of speech, and violates Illinois' school-records act and the state's common law of tortious infliction of emotional distress. The two state law claims are "supplemental" because they have no independent basis of federal jurisdiction (i.e., diversity of citizenship), and, as is usual, the district court relinquished jurisdiction over them when it dismissed Crowley's federal claims before trial. 28 U.S.C. § 1367(c)(3).

The claim he presses hardest is that he has a constitutional right, which the defendants violated, to participate in his children's education. Such participation, he argues, is an aspect of his liberty, and so a state may not deprive him of it on arbitrary grounds, that is, without according him due process of law. He thus is claiming a denial of "substantive" due process. He also claims that he was denied procedural due process, which is to say notice and an opportunity for a hearing before his (substantive) right was taken away from him. We won't have to consider this claim separately. Both claims founder on the scope of the federal constitutional right over the education of one's children.

Crowley relies primarily on a trio of famous Supreme Court decisions that discuss the constitutional rights of parents with respect to the education of their children. *Meyer v. Nebraska*, 262 U.S. 390 (1923), invalidated a Nebraska law that forbade the teaching of foreign languages in private (or public, but that was not in issue) schools. *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), invalidated an Oregon law requiring children to attend public school. And *Wisconsin v.*

*Yoder*, 406 U.S. 205 (1972), invalidated a Wisconsin law that required children to attend high school (public or private) despite the religious objections of the parents, who were Amish and didn't want their children to have a high-school education. *Yoder* isn't pertinent to our case because the parents based their claim on the free-exercise clause of the First Amendment rather than on the due process clause. *Meyer* and *Pierce*, however, establish the principle that the "liberty" that the due process clauses protect includes a degree of parental control over children's education.

But those cases are remote from the present case in two pertinent respects. They are about a state's right to deny, in effect, the option of private education, a denial that is a greater intrusion on parental control of their children than limiting parents' involvement in the activities of the public school that their children attend. And they concern the rights of parents acting together rather than about the rights retained by a divorced parent whose ex-spouse has sole custody of the children and has not joined in the noncustodial parent's claim. In both respects the parental claim in this case is weaker. It is weaker because the challenge is to only one parent's control, the other's remaining unimpaired. It is also weaker because the state interest is stronger. Nebraska's interest in forbidding private schools to teach foreign languages was tenuous to the point of weirdness, while Oregon's project of forcing all children to attend public schools implied a hostility to private education that had no footing in American traditions or educational policy. Quite apart from parental interests, the statist character and conformist consequences of giving the state a monopoly of education sapped Oregon's policy of constitutional weight.

The defendants in the present case are not denying parents the right to send their children to private schools that

will not be arbitrarily forbidden to teach subjects of which the state disapproves. They are not prohibiting home schooling. They are not even denying *the parents* the opportunities that parents commonly enjoy to participate in the education of their children; they are denying these opportunities only to one parent, and that the one who has no custodial rights.

It is difficult for a school to accommodate the demands of parents when they are divorced. The school does not know what rights each of the parents has. It knows which parent has custody, because that parent's address is the student's address, but unless it consults the divorce decree it won't know what rights the other parent has. And since physical and legal custody are different, *In re Custody of Peterson*, 491 N.E.2d 1150, 1152 (Ill. 1986); *In re Howard ex rel. Bailey*, 799 N.E.2d 1004, 1005 (Ill. App. 2003), the school will not even know whether the parent with whom the child lives has joint or, as here, sole custody.

These difficulties are compounded by the scope of the federal constitutional right that Crowley is claiming. It is one thing to say that parents have a right to enroll their children in a private school that will retain a degree of autonomy and thus be free to teach a foreign language, or evolution, or human sexual biology, without prohibition by the state. It is another thing to say that they have a constitutional right to school records, or to be playground monitors, or to attend school functions. Schools have valid interests in limiting the parental presence—as, indeed, do children, who in our society are not supposed to be the slaves of their parents. Imagine if a parent insisted on sitting in on each of her child's classes in order to monitor the teacher's performance or on vetoing curricular choices, texts, and assignments.

Federal judges are ill equipped by training or experience to draw the line in the right place, and litigation over where

to draw it would be bound to interfere with the educational mission. It would do so not only by increasing schools' legal fees but also and more ominously by making school administrators and teachers timid because fearful of being entangled in suits by wrathful parents rebuffed in their efforts to superintend their children's education. Interests of constitutional weight and dignity are on both sides of the ledger because academic freedom, which is an aspect of freedom of speech, includes the interest of educational institutions, public as well as private, in controlling their own destiny and thus in freedom from intrusive judicial regulation. *Grutter v. Bollinger*, 539 U.S. 306, 324 (2003); *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967); *Chicago Board of Education v. Substance, Inc.*, 354 F.3d 624, 630-31 (7th Cir. 2003); *Osteen v. Henley*, 13 F.3d 221, 225-26 (7th Cir. 1993); *Bickerstaff v. Vassar College*, 196 F.3d 435, 455-56 (2d Cir. 1999); *EEOC v. Amego, Inc.*, 110 F.3d 135, 145 (1st Cir. 1997). Paradoxically, in *Meyer* and *Pierce* the state was trying to weaken or encumber private education while here the plaintiff is trying to fasten a constitutional albatross to the neck of a public school.

The intrusion on public education to which Crowley is inviting the federal judiciary is magnified when the right of participation in a child's public-school education is claimed by a noncustodial parent. Of course divorce does not sever the parental relation and by doing so extinguish the fundamental rights that go with it; the state could not "divorce" Crowley from his children unless he were a menace to them. 705 ILCS 405/2-21; 750 ILCS 50/8; *In re D.C.*, 807 N.E.2d 472, 476 (Ill. 2004); *In re Cheyenne S.*, 815 N.E.2d 1186, 1190-91 (Ill. App. 2004); *Quinn v. Neal*, 998 F.2d 526, 532 n. 6 (7th Cir. 1993) (Illinois law). Divorce has become so common that it appears that today as many as 10 percent of all schoolchildren are the children of divorced parents. See

http://www.census.gov/population/socdemo/hh-fam/ cps2003/tabC3-all.pdf. It does not follow that a public school is to be charged with knowledge of the contents of the divorce decrees of its students' divorced parents or that it must allow itself to be dragged into fights between such parents over their children. On the contrary, the more children of divorced parents there are, the greater the burden on schools of arbitrating the quarrels of divorced parents.

Granted, there is no allegation that Crowley and his ex-wife are actually at loggerheads over the education of their children. If they were, Crowley would be denied standing to sue by *Elk Grove Unified School District v. Newdow*, 124 S. Ct. 2301 (2004), the recent "under God" pledge of allegiance case. The Court described it as a case in which the plaintiff "wishes to forestall his daughter's exposure to religious ideas that her mother, who wields a form of veto power, endorses, and to use his parental status to challenge the influences to which his daughter may be exposed in school when he and [the mother] disagree . . . . [I]t is improper for the federal courts to entertain a claim by a plaintiff whose standing to sue is founded on family law rights that are in dispute when prosecution of the lawsuit may have an adverse effect on the person who is the source of the plaintiff's claimed standing." *Id.* at 2311-12. *Newdow* should not be overread to extinguish the constitutional rights of noncustodial parents. Mr. Newdow's right to try to argue his daughter out of believing in God was not in issue. It was *her* right to religious freedom that was in issue and that he was suing to enforce, and all the Court held was that he lacked standing to do so, at least in the face of the custodial parent's objection.

In the procedural posture of the present case we cannot assume that the divorced parents are fighting over their children's education; and anyway the issue is not Crowley's

standing to sue on behalf of his children. But common sense tells us that he and his ex-wife are not cooperating, since she has not joined in his demands on the school.

It is also apparent—indeed it is a part of the complaint with its state law claims and its appended divorce decree— that Crowley has rights under state law that weaken the need to recognize a federal constitutional right. Illinois law entitles him to copies of the children's school records, and the divorce decree makes clear that he has not waived that right and also that he is entitled to enlist his wife's coopera- tion in furthering any legitimate concerns that he has about his children's education. No doubt most divorced parents want to have as little to do with each other as possible. But that interest is no greater than the state's interest in keeping its schools free as far as possible from becoming mired in the sequelae of divorce.

An example will flag another flaw in Crowley's case. Were Mrs. Crowley to move out of School District No. 100, then, since she has sole custody of the children, they would move with her. Suppose her new locale lacked a decent public school and so she enrolled the children in a private school. Because a private school is not a public agency, Mr. Crowley would have no constitutional right to participate in his children's education at their new school. What this example highlights is that in the divorce decree Mr. Crowley surrendered the only federal constitutional right vis-à-vis the education of one's children that the cases as yet recog- nize, and that is the right to choose the school and if it is a private school to have a choice among different types of school with different curricula, educational philosophies, and sponsorship (e.g., secular versus sectarian). It is not a right to participate in the school's management—a right inconsistent with preserving the autonomy of educational institutions, which is itself, as we have noted, an interest of constitutional dignity.

The distinction is illuminated by cases that discuss other aspects of parents' constitutional rights. *Troxel v. Granville*, 530 U.S. 57, 65-73 (2000), invalidated a state law that conferred broad discretion on the state's courts to override a custodial parent's wish to limit (not eliminate) visits by her children's grandparents. The case has a dual significance for the present case. First, it recognizes that one aspect of the parental right is a right against other relatives—a right to prevent a tug of war over the children—in this case Mrs. Crowley's right to decide what school the children shall attend. Second, it suggests the strength that the parental interest must attain to achieve constitutional status. At stake in *Troxel* was Mrs. Granville's control of her children, contested by the grandparents and the court that sided with them. At stake in *Santosky v. Kramer*, 455 U.S. 745 (1982), another case in which a state law was invalidated as an infringement of parental liberty, was the parental right itself. See also *Stanley v. Illinois*, 405 U.S. 645, 646-52 (1972). At stake in the present case is the slighter interest of Mr. Crowley in micromanaging his children's education at the school properly chosen for them.

So we greatly doubt that a noncustodial divorced parent has a federal constitutional right to participate in his children's education at the level of detail claimed by the plaintiff. But if we are wrong it cannot change the outcome of this case. As should be apparent from our discussion, the existence of the right that Crowley asserts is not established law, and McKinney is therefore immune from having to pay damages for violating that right. The school district is not entitled to immunity. But the complaint makes clear that Jordan's (and hence the school district's) participation in McKinney's acts was limited to not doing anything about them. Inaction by a public agency is insufficient participation in a subordinate's misconduct to make the agency liable

in a suit under 42 U.S.C. § 1983 unless the policymaking level at the agency has deliberately decided to take no action against, and thus in effect to condone, to ratify, the misconduct and so adopt it as the agency's (unofficial) policy. *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989); *Lenard v. Argento*, 699 F.2d 874, 886 (7th Cir. 1983); *Berry v. Baca*, 379 F.3d 764, 767 (9th Cir. 2004); *Daskalea v. District of Columbia*, 227 F.3d 433, 441 (D.C. Cir. 2000). And that is not alleged.

We turn to Crowley's double-barreled equal protection claims. He argues first that McKinney discriminates against noncustodial parents. The complaint strongly suggests that McKinney's refusal to allow Crowley access to school records, school premises, and so forth was motivated not by Crowley's status as a noncustodial parent but by animosity toward Crowley arising from the latter's criticisms of the Hiawatha school and its management—that is, McKinney. Insofar as the claim does allege discrimination against noncustodial parents as such, it merely recharacterizes the due process claim as an equal protection claim and encounters the same objections and the same defense of immunity.

That animosity we just mentioned is, however, the pivot on which Crowley's other equal protection claim turns— the claim that he has been singled out by a public official for adverse treatment because of the official's personal hostility toward him. In so claiming Crowley invokes the "class of one" equal protection cases, most recently *Tuffendsam v. Dearborn County Board of Health*, 385 F.3d 1124, 1127 (7th Cir. 2004), where we noted that our cases have articulated two standards for determining whether a "class of one" violation has been shown. The first, set forth in *Hilton v. City of Wheeling*, 209 F.3d 1005, 1008 (7th Cir. 2000), requires "evidence that the defendant deliberately sought to deprive [the plaintiff] of the equal protection of the laws for reasons of a personal nature unrelated to the duties of the defen-

dant's position." The second allows a class-of-one case to be proved simply by showing that the defendant had without a rational basis intentionally treated the plaintiff differently from others similarly situated. But as we went on to explain in *Tuffendsam*, "these divergent strands . . . can . . . be woven together by noting that intentionality is an ambiguous concept, shading at one end into mere knowledge of likely consequences and at the other into a desire for those consequences. The [defendant] 'intentionally' treated the plaintiff worse than it treated her predecessors and neighbors in the sense that it knew—it had to know—that its pattern of enforcement was uneven. But it did not 'intentionally' treat the plaintiff worse in the sense of wanting her to be made worse off than those others. And it is the latter sense in which a 'class of one' case requires a showing that government 'intentionally' treated the plaintiff worse than others." 385 F.3d at 1187.

If McKinney would not have treated Crowley as he did had it not been for his strong personal dislike of the latter, he denied him the equal protection of the laws under either formulation. Denied it prima facie, that is to say; for animus is not a sufficient condition for a class-of-one claim to succeed. If McKinney, however much he disliked Crowley, would have acted the same way toward him had he not disliked him, perhaps because Crowley's behavior was disrupting school discipline, then the concurrence of an improper motive would not condemn the act. *Palmer v. Thompson*, 403 U.S. 217, 224-26 (1971); *Grossbaum v. Indianapolis-Marion County Building Authority*, 100 F.3d 1287, 1293 (7th Cir. 1996); *Nottelson v. Smith Steel Workers D.A.L.U. 19806, AFL-CIO*, 643 F.2d 445, 454 n. 11 (7th Cir. 1981). And that may well be the case. But we have only the complaint to go on. As this claim was adequately pleaded, the dismissal of it on the pleadings was premature.

And likewise the dismissal of the First Amendment claim. The district judge thought that Crowley was alleging only a personal dispute with McKinney and Jordan. The Constitution does not protect a public employee from workplace retaliation for statements that were intended not to alter public opinion or beliefs but merely to resolve a personal grievance on favorable terms. *Connick v. Myers*, 461 U.S. 138, 146-47 (1983); *Kokkinis v. Ivkovich*, 185 F.3d 840, 843-44 (7th Cir. 1999); *Cobb v. Pozzi*, 363 F.3d 89, 101-02 (2d Cir. 2004). And there is no doubt that most of the criticisms that Crowley made of the defendants are correctly described as "personal." But we cannot overlook the allegation in the complaint that "in the years leading up to the acts complained of in this Complaint, Plaintiff had been, at times, openly critical of Hiawatha School, District #100 and, by implication, the leadership and direction of Superintendent Jordan and Defendant McKinney, at public meetings." So the criticisms preceded the specific dispute and were expressed not merely openly but at public meetings. The next paragraph of the complaint, moreover, states that "the Plaintiff has *also* questioned and criticized McKinney and Jordan directly" about the school's "inadequate responses to incidents of Plaintiff's son being bullied," etc., and the word we've italicized indicates a transition to the criticisms that were incidental to Crowley's specific grievance over the school's failure as he saw it to do right by his son. The latter criticisms may not be protected by the First Amendment, but the former are.

Because we are reversing the dismissal of two of the federal claims, the district court should reinstate the supplemental state claims. If on remand the federal claims are again dismissed before trial, the court will of course be free to again relinquish jurisdiction over the state claims.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

WOOD, *Circuit Judge*, dissenting in part, concurring in part. This case is about a father's constitutional right to participate meaningfully in the upbringing of his children. The question, as I see it, is whether the state (in this case through the agency of a local school district and its principal) may effectively terminate a noncustodial father's parental rights, through measures that deprive him altogether from the most important activity in which children under the age of eighteen engage: their education. The majority sees no federal constitutional dimension in the deprivations that the school district has imposed upon Daniel Crowley, notwithstanding the existence of Supreme Court cases directly recognizing these kinds of parental rights and notwithstanding the fact that its assumptions about the degree to which his parental rights have been circumscribed by virtue of his divorce decree are exaggerated at best, mistaken at worst. Unless we are to create a new exception to cases brought under 42 U.S.C. § 1983 for actions like this that conceivably could be addressed by state family law courts—an action that I believe to be beyond this court's authority, even if the Supreme Court might choose to take this step some day—Crowley is entitled to proceed on his liberty claims. To the extent that the majority opinion holds otherwise, I dissent. I concur in the majority's conclusion that Crowley has stated an equal protection claim and a First Amendment claim that must be reinstated, along with his supplemental state claims.

The difference between the majority and myself goes to the heart of one's understanding of the Due Process Clause's protection of certain fundamental liberties. The majority acknowledges the "trio" of Supreme Court decisions that recognize constitutional rights of parents with respect in particular to the education of their children: *Meyer v. Nebraska*, 262 U.S. 390 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510

(1925); and *Wisconsin v. Yoder*, 406 U.S. 205 (1972). (If these cases have something to say about other "privacy" rights, such as the right to choose whether to have an abortion, see *Roe v. Wade*, 410 U.S. 113, 152-53 (1973), surely they have even more to say about the topic directly at issue—namely, parental rights in education.)

Contrary to the majority's suggestion, this line of cases is not remote from the present case in any respect. First, even if they were about the state's right to deny parents the right to choose one form of education for their children—private education—the present case is about the state's ability to deny a parent's right to participate at all in the free public education to which every child in the State of Illinois is entitled. See Ill. Const. Art. 10 § 1. I would be hard pressed to characterize the latter as somehow "less important" than deprivation of the choice to use private schools. Second, the majority gleans from the earlier cases the proposition that they concern only the rights of parents acting together. But there is nothing at all in those decisions that hints at such a distinction. As I discuss in a moment, the Supreme Court's cases over the course of the last hundred years have all looked in the opposite direction, by recognizing and supporting the rights of less traditional parents.

In fact, as a sheer matter of *realpolitik*, the majority's rule courts disaster for an enormous number of children in this country whose parents have become divorced. For example, in the provisional data presented on a state-by-state basis for 2003 published by the National Vital Statistics Reports, we learn that in Illinois that year there were 82,076 marriages and 34,553 divorces (that is, 42% of the number of marriages). Illinois, however, has a divorce rate on the low end of the spectrum. In Texas, the numbers are 167,341 marriages and 80,092 divorces (48%); in New York there were 120,754 marriages and 62,294 divorces (52%); in Colorado

there were 36,387 marriages and 19,280 divorces (53%); and in Florida there were 155,240 marriages and 84,496 divorces (54%). National Vital Statistics Reports, vol. 52, no. 22, June 10, 2004, Table 3, available at http://www.cdc.gov/nchs/ data/nvsr/nvsr52/nvsr52_22.pdf. (Unfortunately the table does not present aggregate national figures, because some states do not furnish divorce statistics.) To take a common phrase out of context, the majority's rule would result in quite a few children "left behind," in the sense that the states could with impunity deprive one of the two parents of the right to participate in the child's education.

In fact, as I have already noted, the principle that the "liberty" protected by the Due Process clauses includes a parent's right to control the upbringing and education of his children is well-established. Moreover, as the majority acknowledges, "divorce does not sever the parental relation and by doing so extinguish the fundamental rights that go along with it; the state could not 'divorce' Crowley from his children unless he were a menace to them." *Ante* at 7-8. And lest there remain any question whether a noncustodial parent's rights evaporate after relinquishing custody, the majority opinion correctly notes that the Supreme Court's recent decision in *Elk Grove Unified Sch. Dist. v. Newdow*, 124 S. Ct. 2301 (2004), "should not be overread to extinguish the constitutional rights of noncustodial parents." *Ante* at 8.

Notwithstanding its nod toward these principles, the majority implies that a noncustodial parent's fundamental rights are not entitled to the same degree of protection as those of the custodial parent. Nothing in the Constitution, however, supports such a proposition. While a state may limit any parent's access to and responsibility for his children, the Court has emphasized that parental rights may not be extinguished arbitrarily. *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) ("The fundamental liberty interest of natural

parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State."). Getting somewhat closer to our case, the Court has also rejected the claim that the relationship between natural parents and children born out of wedlock is not worthy of equal constitutional protection. See *Stanley v. Ill.*, 405 U.S. 645, 651 (1972) (holding that an unwed father retains the fundamental interest and right to raise his children and the law cannot refuse to recognize those family relationships not "legitimized" by a marriage ceremony); *Caban v. Mohammed*, 441 U.S. 380, 394 (1979) (striking down a New York law permitting an unwed mother, but not an unwed father, to block the adoption of their child on equal protection grounds). Even where the Court has rejected an unwed father's challenge to an adoption, it did so not on the basis of his status, but rather on the basis of whether a relationship exists *at all* between the father and his children. See *Quilloin v. Walcott*, 434 U.S. 246, 256 (1978) (holding that the protected interests of a father not fully committed to parenthood and thus possessing only a potential relationship with his child are less significant than those of a parent who has assumed that responsibility); *Lehr v. Robertson*, 463 U.S. 248, 261-62 (1983) (same).

These cases tell us that a noncustodial parent's interests are no less significant than those of other parents. There is no question that Crowley is fully committed to parenthood—he seeks to continue to develop the relationships he has had with his children since their birth. Nor are there any allegations that he is unfit to continue in his role as a parent. Perhaps the majority is concerned by the entirely hypothetical prospect of having to "arbitrat[e] the quarrels of divorced parents," but as it readily acknowledges, the right Crowley seeks to assert is not incompatible with the custodial parent's exercise of her rights. *Ante* at 8.

Even if there were some tension between the rights of the two parents, it does not follow that the Constitution affords lesser protection to a noncustodial parent. As is the case with the property component of the Due Process clause, the Constitution does not create liberty interests; it merely protects interests created elsewhere, usually under state law. See, *e.g.*, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985); *Paul v. Davis*, 424 U.S. 693, 710 (1976). We must therefore look to state law to see what parental rights Crowley retained after his divorce. See *Newdow*, *supra*, 124 S. Ct. at 2311 (looking to state law to determine whether a noncustodial father's right to inculcate his daughter with his religious beliefs and bring a claim on her behalf was extinguished under a divorce decree).

Under Illinois law, divorce does not automatically extinguish all parental rights. See 750 ILCS § 5/602.1(a) ("[T]he dissolution of marriage . . . or the parents living separate and apart shall not diminish parental powers, rights, and responsibilities except as the court for good reason may determine" under the best interest of the child standard). Nor does it limit a noncustodial parent's right to participate in his or her children's education. To the contrary: section 5 of the Illinois School Student Records Act (ISSRA) provides that "a parent shall have the right to inspect and copy all school student permanent and temporary records of that parent's child," and only restricts this right in the case of a parent "who is prohibited by an order of protection from inspecting or obtaining school records of a student pursuant to the Illinois Domestic Violence Act of 1986." 105 ILCS 10/5(a); see also 105 ILCS 10/2(g) (" 'Parent' means a person who is the natural parent of the student or other person who has the primary responsibility for the care and upbringing of the student.").

The statute addresses both sides of the coin: after conferring on the parent the right to inspect and copy his child's

school records, it imposes on the school the obligation to comply with a noncustodial parent's request to exercise this right. See 105 ILCS 5/10-21.8 ("In the absence of any court order to the contrary to require that, upon the request of either parent of a pupil whose parents are divorced, copies of the following: reports or records which reflect the pupil's academic progress, reports of the pupil's emotional and physical health, notices of school-initiated parent-teacher conference, notices of major-school sponsored events, such as open houses, which involve pupil-parent interaction, and copies of school calendar regarding the child which are furnished by the school district to one parent be furnished by mail to the other parent.").

The default rule in Illinois is thus one that recognizes a noncustodial parent's right to participate in his children's education. Crowley's parental rights thus extend at least that far, unless there is something in his divorce decree to the contrary. There is not. The Crowleys' martial settlement agreement, incorporated in their divorce decree, provides that both parents "shall have joint and equal rights of access to [their children's] records that are maintained by third parties, including . . . their education . . . records." Crowley expressly retains the right to receive information concerning school activities, as the agreement provides that "[e]ach party shall direct the children's school authorities to promptly advise each of them of their children's grades and progress in school and of all school meetings, functions and activities that are open to attendance by parents." Thus, under both state law and the divorce decree, Crowley has the right to participate in his children's education. Nothing suggests that his status as the noncustodial parent dilutes that right at all.

Crowley's complaint, which we must accept as true for present purposes, alleges that the defendants engaged in a

pattern of conduct that amounted to a complete deprivation of this right. Not only is he barred from school grounds during the day and excluded from class and school functions open to attendance by all parents, but his requests for his children's school records and calendars, to which he is entitled by law, were also denied. Furthermore, the school also refuses to respond to his concerns about the safety of his children or to his inquiries regarding whether his children were in attendance on a particular day. These actions amount to an absolute barrier to Crowley's right to participate in his children's education. How can he exercise this right when he does not know what his children are being taught or even whether his children are in school?

The majority justifies its holding in part by a concern for the school's interest in academic freedom, but nothing that Crowley is seeking would interfere at all with the educational mission of the school. He has no quarrel with the school's curriculum. Nor does he seek any extraordinary privileges, such as the right to sit in his children's classes to monitor the teacher's performance, or the right to dictate what or how his children will be taught. Rather, he challenges only his exclusion from activities and information that are available to all other parents, under whatever neutral criteria the school has chosen to adopt.

The majority's fears about disruption brought about by a parent's request for his children's school records—an intrusion it finds magnified when the request comes from a noncustodial parent—are wholly unsupported by Illinois law. A school has little discretion in this matter, because the rules are set by state law. It need not consult a divorce decree or inquire into the relationship between the parents to determine whether the noncustodial parent retains the right to this information. Instead, under the statute, it is required to proceed on the assumption that this right has not

been extinguished in the absence of a court order stating the contrary. See 105 ILCS 5/10-21.8 ("[A] school board shall not . . . refuse to mail copies of reports, records, notices or other documents regarding a pupil to the parent of the pupil . . . unless the school board first has been furnished with a certified copy of the court order prohibiting the release of such reports, records, notices or other documents to that parent."). Unless or until the school receives such a certified copy of a court order, it knows what it must do: furnish the information to both parents, custodial and non-custodial alike.

The existence of these Illinois laws might make one ask why Crowley turned to the federal court to redress this grievance, instead of going to either the Illinois court that granted his divorce or to any competent Illinois court empowered to enforce the obligations created by state law. The short answer is that there is no general exhaustion re-quirement that governs cases under § 1983—a proposition the Supreme Court has recognized for many years. See, *e.g.*, *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (once a wrong has properly been characterized as a constitutional tort, the fact that it may also be redressable under state law does not bar the victim from bringing an action under § 1983); *Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 516 (1982) (no administrative exhaustion requirement for § 1983 claims). The question is therefore whether there is something about Crowley's case that would justify an exception to that general rule.

In the area of takings law, the Supreme Court has crafted a ripeness rule that has an effect similar to that of an ex-haustion requirement: it has held that a claim of an uncon-stitutional taking is not ripe until the governmental entity charged with implementing the regulatory scheme has reached a final decision. *Williamson County Reg'l Planning*

*Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985). Given the primary responsibility that states have for the field of family law, *cf.* 13B Wright, Miller & Cooper § 3609 (2d ed. 1984) (discussing the judicially created limitation on diversity jurisdiction for domestic relations cases), perhaps the Supreme Court might hold some day that a parental rights claim of the type Crowley is pressing is not ripe until state remedies have been exhausted.

There is no doubt that Illinois provides a wide range of remedies that might produce the result he wants. Under the ISSRA, Crowley has the right to seek injunctive relief in state court for the violation of the Act allegedly committed by the school district when it denied him access to his children's school record. ISSRA § 9(a), 105 ILCS 10/9(a) ("Any person aggrieved by any violation of this Act may institute an action for injunctive relief in the Circuit Court of the County in which the violation has occurred or the Circuit Court of the County in which the school is located."); see *John K. v. Bd. of Educ. for Sch. Dist. No. 65*, 504 N.E.2d 797, 802 (Ill. App. Ct.), *appeal denied*, 511 N.E.2d 429 (Ill. 1987). Crowley can also bring a claim against school district officers for their failure to discharge their duties. See 105 ILCS 5/22-8 ("If any county superintendent, trustee, director, or other officer negligently or wilfully fails or refuses to make, furnish or communicate statistics and information, or fails to discharge any other duties enjoined upon him, at the time and in the manner required by this Act, he shall be guilty of a petty offense and shall be liable to a fine of not less than $25, to be recovered before any circuit court at the suit of any person on complaint in the name of the People of the State of Illinois, and when collected the fine shall be paid to the county superintendent of schools."). Finally, if the source of the problem is in the divorce decree itself, Crowley has the right to return to that court and seek a modification of the decree.

The only problem with this theory is the not-so-small flaw that it flies in the face of well-established rules governing a person's right to invoke § 1983 in federal court to redress violations of federal constitutional or statutory law. I merely note the possibility because, when all is said and done, the thrust of the majority's opinion seems to be that such a solution would be preferable. But it is not for us to reject an otherwise sound claim under § 1983 just because it overlaps to a greater or lesser degree with state remedies.

When the Supreme Court invalidated an Oregon law requiring parents to send their children to public school, it explained that "[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Pierce*, 268 U.S. at 535. Depriving a parent of all information concerning his children's education such that he is effectively shut out of this aspect of parenting conflicts with that long-established right. I would therefore find that Crowley has stated a claim, and that Principal McKinney is not entitled to qualified immunity. I respectfully dissent from this portion of the opinion, and I concur in the majority's decision to remand the equal protection and First Amendment claims and to reinstate the supplemental state claims.


A true Copy:

          Teste:


                                    _____

                                    *Clerk of the United States Court of*
                                    *Appeals for the Seventh Circuit*