# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 04-2075

WILLIAM A. BOOKS,

*Plaintiff-Appellee*,

v.

ELKHART COUNTY, Indiana,

*Defendant-Appellant.*

———————

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 03 C 233—**Robert L. Miller, Jr.**, *Chief Judge.*

———————

ARGUED NOVEMBER 3, 2004—DECIDED MARCH 25, 2005

———————

Before FLAUM, *Chief Judge*, EASTERBROOK and SYKES,
*Circuit Judges.*

SYKES, *Circuit Judge.* This case tests the constitution-
ality of a display of the Ten Commandments on public
property. The display in question is a framed text of the
King James version of the Ten Commandments, one of nine
historical texts and symbols that comprise a "Foundations
of American Law and Government Display" in the County
Administration Building in Elkhart County, Indiana. Au-
thorized by resolution of the Elkhart County Board of

Commissioners, the exhibit includes a selection of significant historical documents and symbols that, according to the resolution, "positively contribute to the educational foundation and moral character of the citizens of [Elkhart] county." Evaluating the display under the three-part test of *Lemon v. Kurtzman*, 403 U.S. 602 (1971), the district court held that the inclusion of the Ten Commandments violates the First Amendment's Establishment Clause because the County had no purpose other than "paying homage to the Ten Commandments," a sacred religious text. The court ordered the County to remove the Ten Commandments from the display.

We reverse. The display satisfies the *Lemon* test and is therefore constitutional under the First Amendment. The County's stated purposes—to educate its citizens in the history of American law and politics and provide moral uplift—are secular, and we see no good reason to doubt the County's sincerity. Nor is the primary effect of the display to advance religion. The inclusion of the Ten Commandments in a multifaceted historical exhibit of texts and images that have influenced or symbolized American law and government cannot reasonably be understood as an endorsement of religion.[1]

## I. Background

The pertinent facts are undisputed. Two individuals approached government officials in Elkhart County, Indiana, and offered to donate a set of documents for display. The set included the Preamble to the Indiana Constitution, the

---

[1] Books has not argued that the display excessively entangles government with religion, the third inquiry under *Lemon v. Kurtzman*, 403 U.S. 602, 613 (1971), so we do not address that issue.

national motto, the national anthem, an image of Lady Justice, the Declaration of Independence, the Mayflower Compact, the Bill of Rights to the United States Constitution, the Magna Carta, and the Ten Commandments. County Commissioner Martin McCloskey asked the county attorney to draft a resolution authorizing a display of the documents, along with the flags of the United States and Indiana. This was done, and on March 17, 2003, the County Commission passed a resolution authorizing installation of the display.

The resolution sets forth the County's view that the documents included in the display are historically significant and educationally valuable to the citizens of Elkhart County. In particular, it states as a general matter that "a sense of historical context, civic duty, and responsibility, and the general application and understanding of the law of this land, are all desirable components of the education of the citizens of this county." The resolution goes on to say that the documents included in the display "positively contribute to the educational foundation and moral character of the citizens of this county."

Acknowledging that "there may be other symbols, documents, speeches, letters, and writings that are equally important as those mentioned," the resolution states the Commission's opinion that the documents and symbols in the display, "taken as a whole, are valuable examples of documents and symbols that may instill qualities desirable of the citizens of this county, and have had particular historical significance to the development of this country." The Commissioners resolved to "support these historical documents and symbols, and also support the public display of the above documents and symbols." The resolution specifies that the display will be erected on the walls of the County Administration Building "and at such other public facilities of Elkhart County Government as shall from time to time hereafter be designated by the Commissioners."

The very day the resolution passed the display was erected on a wall on the first floor of the County Administration Building, near the entrance to the County Commissioners' offices. The display consists of ten individually framed images and documents—the nine historical documents and a separately framed explanation of the display—flanked by the flags of Indiana and the United States. The identically sized frames hang at eye level and are placed approximately two inches from one another, forming a bunched grouping in two rows. The explanation is placed at the far right-hand end of the display. Each of the historical texts and symbols is identically sized and matted inside a frame measuring approximately 11 x 14 inches. Given the varying lengths of the historical texts, the typeface of the documents is not identical, but from the photographs included in the record, they appear nearly the same.

The separately framed explanation sets forth a one- or two-paragraph exposition of the historical significance of each text and symbol. These explanations are generally narratives of the origin and purpose of the historical text or symbol in question, along with a brief comment on the text's significance in American history. For instance, the explanation refers to the Mayflower Compact as "the first written constitution in the New World" and quotes its author, William Bradford, describing why the settlers of Plymouth, Massachusetts, created the Compact. The Declaration of Independence is rated "perhaps the single most important document in American History . . . the 'frame' into which the Framers placed the Constitution," the fundamental premise of which is that "[g]overnment is not a giver of rights, but a protector of God-given rights." The Magna Carta is described as the origin of the concept of the rule of law and is related forward to the American war of independence: "[T]he American patriots . . . waged war against England to preserve liberties originating in 13th century England."

The explanation provides the little-known fact that the national motto, "In God We Trust," was derived from a line in the Star-Spangled Banner. Another section of the explanation vividly describes how Francis Scott Key wrote the poem that became our national anthem while observing the battle of Fort McHenry during the War of 1812. The explanation states that the Preamble to the Indiana Constitution "derives directly from the idea that Government is not a giver of rights, but a protector of God-given rights." The Bill of Rights is described as a check on the potential tendency to tyranny within the newly organized American government and "a vital and powerful force in American Government, shaping our laws and serving as a check on the exercise of government power." The explanation also discusses the symbolism of the Lady Justice icon.

In comparison with the other texts, the description of the Ten Commandments is relatively short and contains no information about its origins. Instead, the explanation focuses on the historical significance of the Ten Commandments:

> The Ten Commandments have profoundly influenced the formation of Western legal thought and the formation of our country. That influence is clearly seen in the Declaration of Independence, which declared that "We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the pursuit of Happiness." The Ten Commandments provide the moral background of the Declaration of Independence and the foundation of our legal tradition.

The display presents the Ten Commandments (*Exodus* 20:3-17) in the King James version:

> Thou shalt have no other gods before me.

> Thou shalt not make unto thee any graven image, or any likeness of any thing that is in heaven above, or

that is in the earth beneath, or that is in the water underneath the earth: Thou shalt not bow down thyself to them, nor serve them: for I the LORD thy God am a jealous God, visiting the iniquity of the fathers upon the children unto the third and fourth generation of them that hate me.

Thou shalt not take the name of the LORD thy God in vain: for the LORD will not hold him guiltless that taketh his name in vain.

Remember the Sabbath day, to keep it holy.

Honour thy father and thy mother: that thy days may be long upon the land which the LORD thy God giveth thee.

Thou shalt not kill.

Thou shalt not commit adultery.

Thou shalt not steal.

Thou shalt not bear false witness against thy neighbour.

Thou shalt not covet thy neighbour's house, thou shalt not covet thy neighbour's wife, nor his manservant, nor his maidservant, nor his ox, nor his ass, nor any thing that is thy neighbour's.

William Books filed this lawsuit against the County under 42 U.S.C. § 1983, together with a separate motion for preliminary injunction. He asked the district court to order the County to remove the Ten Commandments from the display, asserting that their inclusion violated the First Amendment's ban on government establishment of religion. At the parties' request, the court consolidated the preliminary injunction motion with the merits of the case and then ruled on the parties' cross-motions for summary judgment.

The district court held that the County's display of the Ten Commandments failed the first, or "purpose," prong of

the *Lemon* test, and therefore violated the First Amendment. According to the court, the County had two purposes for including the Ten Commandments in the larger display: (1) to contribute to the moral character of the County's citizens and (2) to bolster the historical knowledge of County residents. The court held that the first stated purpose was impermissible, since by seeking to improve the moral character of the citizenry by displaying a sacred religious text the County's purpose was in fact religious, not secular, as *Lemon* requires. The court also held that the second stated purpose "doesn't fit with the Display's content," in that the display does not actually establish an historical connection between the Ten Commandments and the other texts included in the exhibit and therefore fails to embody the secular purpose that supposedly motivates the County. The district court ordered the County to remove the Ten Commandments from the display. Elkhart County appealed.

## II. Discussion

### A. Standing

The County offers a brief argument on the issue of standing, asserting that Books' alleged injury—direct and unwelcome contact with a religious object that deeply bothers him—is trivial and therefore not legally cognizable. The County argues that Books' injury is entirely psychological, and that such injuries, without more, do not confer standing.

The County's argument is foreclosed by our decision in *Books v. City of Elkhart*, 235 F.3d 292, 299-301 (7th Cir. 2000). There, the selfsame William Books brought a successful Establishment Clause claim against the City of Elkhart over a granite Ten Commandments monument that stood on the lawn of the City's municipal building. Our opinion in *Books* reiterated the general rule that to have standing to sue in federal court a "plaintiff must allege (1)

that he has suffered an injury in fact (2) that is fairly traceable to the action of the defendant and (3) that will likely be redressed with a favorable decision." *Id.* at 299 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). An "injury in fact" is an "invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Id.* (citing *Lujan*, 504 U.S. at 560).

We noted that in Establishment Clause cases a plaintiff can allege injury in fact from a government display of a religious object by alleging that he has undertaken a "special burden" or has altered his behavior to avoid the object that gives him offense. *Id.* at 299 (citing, *inter alia*, *Freedom from Religion Found., Inc. v. City of Marshfield*, 203 F.3d 487, 489 (7th Cir. 2000) (avoiding use of a park)); *Gonzales v. North Township*, 4 F.3d 1412, 1416-17 (7th Cir. 1993) (avoiding use of part of a park); and *Harris v. City of Zion*, 927 F.2d 1401, 1405 (7th Cir. 1991) (altering travel routes). Such changes in behavior, though sufficient to confer standing, are not a prerequisite, however. *Id.* at 300 (citing *Doe v. County of Montgomery*, 41 F.3d 1156, 1160-61 (7th Cir. 1994) (plaintiff is not required to show "special burden" or altered behavior in order to have standing)). In *Books* and *Doe* we held that it is enough for standing purposes that a plaintiff allege that he "must come into direct and unwelcome contact with the religious display to participate fully as [a] citizen[ ] . . . and to fulfill . . . legal obligations." *Id.* at 299 (citing *Doe*, 41 F.3d at 1159).

Books and his fellow plaintiff in our earlier *Books* case alleged that they were forced to come into direct and unwelcome contact with the City of Elkhart's outdoor Ten Commandments monument when they entered the municipal building to conduct business or attend public meetings and when they visited the adjacent public library. *Id.* at 297. We held this sufficient to confer standing. *Id.* at 300-01. The injury Books alleges in this case cannot be distinguished

from the injury he alleged in his successful challenge to the City of Elkhart's Ten Commandments monument. Here, Books has alleged that he must pass by the County's "Foundations" display at least once a year in order to pick up a form he needs to obtain a waiver of excise tax on his automobile. He also alleged that he must pass by the display when he visits the County Health Department or when he goes to the County Administration Building to obtain maps, which he has done in the past. He has alleged that if he chooses to attend a meeting of the County Commissioners, he will be forced to come into unwelcome contact with the display. On the question of standing, the only difference between this case and Books' earlier one is that the display in question here is located inside a municipal building rather than directly outside it; this difference is not significant. Books has standing, and we proceed to the merits.

## B. First Amendment

Under the familiar three-part test set forth in *Lemon*, government action does not violate the First Amendment's ban on the establishment of religion if it has a secular purpose, if its principal or primary effect is one that neither advances nor inhibits religion, and if it does not foster an excessive government entanglement with religion. *Lemon*, 403 U.S. at 612-13; *County of Allegheny v. ACLU*, 492 U.S. 573, 592 (1989). Government action violates the First Amendment if it fails any one of these three inquiries. *Edwards v. Aguillard*, 482 U.S. 578 , 583 (1987).

*Lemon*'s days may be numbered; we are aware that the Supreme Court's resolution of two Ten Commandments cases accepted for review this Term may undo our work here. *See Van Orden v. Perry*, 351 F.3d 173 (5th Cir. 2003), *cert. granted*, 125 S.Ct. 346 (2004); *ACLU of Ky. v. McCreary County*, 354 F.3d 438 (6th Cir. 2003), *cert. granted*, 125 S.Ct.

310 (2004). In *McCreary County*, the Ten Commandments appear in public displays that are substantially similar to the display at issue in this case.[2] The petitioners there have asked the Court to overrule *Lemon*.

Nevertheless, we have before us a fully briefed and argued case that is ripe for decision. Despite persistent criticism from several of the Justices,[3] *Lemon* has not been overruled, and we are compelled to follow the approach it established. *See State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) (it is the prerogative of the Supreme Court alone to overrule one of its precedents); *see also Agostini v. Felton*, 521 U.S. 203, 217 (1997) ("The views of five Justices that the case should be reconsidered or overruled cannot be said to have effected a change in Establishment Clause law."). Accordingly, we

---

[2] In *ACLU of Ky. v. McCreary County*, 354 F.3d 438 (6th Cir. 2003), *cert. granted*, 125 S.Ct. 310 (2004), a divided panel of the Sixth Circuit invalidated public displays of the Ten Commandments with other historical documents in two Kentucky county courthouses and in schools in a third Kentucky county. The Supreme Court has before it the portion of the case involving the courthouse displays. Our case differs from *McCreary County* in that the displays in Kentucky originated as displays of the Ten Commandments alone rather than in combination with other documents in an exhibit; after litigation was commenced, the displays were modified to include the additional documents. *McCreary County*, 354 F.3d at 440-41. *Van Orden v. Perry*, 351 F.3d 173 (5th Cir. 2003), *cert. granted*, 125 S.Ct. 346 (2004), concerns a Ten Commandments monument on the grounds of the Texas State Capitol.

[3] *See, e.g.*, *Lee v. Weisman*, 505 U.S. 577, 644 (1992) (Scalia, J., dissenting, joined by Rehnquist, C.J., and White and Thomas, JJ.); *County of Allegheny v. ACLU*, 492 U.S. 573, 655-56 (1989) (opinion of Kennedy, J., joined by Rehnquist, C.J., and White and Scalia, JJ.); *Aguilar v. Felton*, 473 U.S. 402, 426-30 (1985) (O'Connor, J., dissenting, joined by Rehnquist, C.J.); *Wallace v. Jaffree*, 472 U.S. 38, 110 (1985) (Rehnquist, C.J., dissenting).

proceed to decision applying the *Lemon* test, and our review is de novo.[4] *Books*, 235 F.3d at 298.

### 1. Secular Purpose

The first step in the *Lemon* analysis requires us to determine whether Elkhart County's inclusion of the Ten Commandments in the "Foundations" display has a secular purpose. The "purpose" inquiry of the *Lemon* test "asks whether the government's actual purpose is to endorse or disapprove of religion." *Edwards v. Aguillard*, 482 U.S. 578, 585 (1987) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 690 (1984) (O'Connor, J., concurring)). The government's articulation of a secular purpose is insufficient by itself to avoid conflict with the First Amendment. *See Abington Sch. Dist. v. Schempp*, 374 U.S. 203 (1963) (holding unconstitutional the daily reading of Bible verses in public schools despite school district's assertion of secular purpose). However, we generally defer to the government's articulated purpose "as long as it is not a sham." *Ind. Civil Liberties Union v. O'Bannon*, 259 F.3d 766, 771 (7th Cir. 2001); *see also Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308 (2000); *American Jewish Cong. v. City of Chi.*, 827 F.2d 120, 127 (7th Cir. 1987).

The Supreme Court has held that government action lacks a valid secular purpose under *Lemon* only when there

---

[4] Our colleague suggests that we are not obliged to follow *Lemon*'s approach because it has been applied inconsistently and a majority of the Justices have disavowed it (though not at the same time). We disagree, and contrast this suggestion with our colleague's relatively recent view of *Lemon*'s continued force. *See United States v. Booker*, 375 F.3d 508, 516 (7th Cir. 2004) (Easterbrook, J., dissenting) (acknowledging that although it "has been disparaged by most sitting Justices," *Lemon* "has not been overruled").

is "no question that the statute or activity was motivated wholly by religious considerations." *Lynch*, 465 U.S. at 680. Thus, the secular purpose requirement "does not mean that the government's purpose must be unrelated to religion." *American Jewish Cong.*, 827 F.2d at 126. "Rather, the purpose requirement 'aims at preventing the relevant governmental decision maker . . . from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters.' " *Id.* (quoting *Corp. of the Presiding Bishop v. Amos*, 483 U.S. 327, 335 (1987)). We examine the content, design, placement, and context of the "Foundations" display to determine whether the inclusion of the Ten Commandments was motivated by a valid secular purpose. *Books*, 235 F.3d at 302; *O'Bannon*, 259 F.3d at 771; *American Jewish Cong.*, 827 F.2d at 126-27.

The Ten Commandments are "undeniably a sacred text in the Jewish and Christian faiths." *Stone v. Graham*, 449 U.S. 39, 41 (1980). Although six of the Commandments address "arguably secular matters," *id.*, the first four, which command believers to worship the Lord God alone, to avoid idolatry, not to use the Lord's name in vain, and to observe the Sabbath, are "wholly religious in nature, and serve no conceivable secular function." *O'Bannon*, 259 F.3d at 770-71; *Stone*, 449 U.S. at 41-42. But the permissibility of this display does not depend solely on the religious character and origin of the text. That the Ten Commandments are religious in nature does not mean that their public display must have been motivated by religious intent or purpose. In *Stone* the Supreme Court suggested that biblical texts may be constitutionally integrated into "an appropriate study of history, civilization, ethics, comparative religion, or the like." *Stone*, 449 U.S. at 42 (citing *Abington*, 374 U.S. at 225). This court has recognized that "[t]he text of the Ten Commandments no doubt has played a role in the secular development of our society and can no doubt be presented by the government as playing such a role in our civic order."

*Books*, 235 F.3d at 302. That is precisely what Elkhart County purports to be doing with the "Foundations" display.

The Elkhart County Board of Commissioners formally identified by resolution two purposes behind the "Foundations" exhibit: to "contribute to the educational foundation and moral character of the citizens of this county." The explanation posted with the exhibit tells viewers that "[t]he Foundations of American Law and Government display contains documents that played a significant role in the foundation of our system of law and government." As to the Commandments in particular, the explanation states that "[t]he Ten Commandments have profoundly influenced the formation of Western legal thought and the formation of our country." Considered in the context of the "Foundations" display as a whole, these statements reflect an effort by the County to erect a display within the limits of the permissible purposes articulated by the Supreme Court in *Stone* and this court in the first *Books* case.

The district court gave two reasons why it believed the display failed the purpose prong of *Lemon*. First, the court concluded that any attempt to contribute to the moral character of the citizenry through a display of a religious text such as the Ten Commandments was necessarily an effort to impose a religious code of conduct, impermissible under *Books* and *O'Bannon*. Second, the court rejected the educational purpose behind the display because it viewed the historical connection between the Ten Commandments and the other documents in the exhibit as too weak. We do not read *Books* and *O'Bannon* so broadly, and we disagree that the First Amendment requires a precise and provable historical link between the Ten Commandments and the secular texts and symbols included in the "Foundations" exhibit.

As a general matter, the district court circumscribed its focus and considered the Ten Commandments in isolation

from the other documents in the "Foundations" display. The court interpreted the County's "moral uplift" purpose as applying to the Ten Commandments individually, rather than to the display as a whole, and concluded that to impute moral value to the Ten Commandments is to communicate a religious message. The Supreme Court has cautioned against so narrow an analysis: "[To] focus exclusively on the religious component of any activity would inevitably lead to its invalidation under the Establishment Clause." *Lynch*, 465 U.S. at 680.

The district court concluded that *Books* and *O'Bannon* left it no choice but to reject the County's "moral character" purpose. *Books* and *O'Bannon* concerned the constitutionality of public displays of singular stone monuments depicting the Ten Commandments, not the inclusion of the Ten Commandments in a display of many documents. In each case, we evaluated the purpose of the public display in its entire context. We noted in *Books* that "[t]he Supreme Court has stressed the importance of the context of a clearly religious symbol in determining whether the purpose in displaying the symbol is religious or secular." *Books*, 235 F.3d at 303. And in *O'Bannon* we said that "[b]eyond assessing the purpose expressly articulated by the state, we ensure that the stated secular purpose is legitimate by also examining the context and the content of the display." *O'Bannon*, 259 F.3d at 771.

We emphasized in *Books* that "religious symbols should not be considered in the abstract; instead, courts must ask 'whether the particular display at issue, considered in its overall context, could be said to advance religion.'" *Books*, 235 F.3d at 303 (quoting *American Jewish Cong.*, 827 F.2d at 125). We rejected the stated secular purpose in both *Books* and *O'Bannon*—to provide a "code of conduct" (*Books*) and a statement of "core values" (*O'Bannon*)—because the overall context of the displays did nothing to dilute the religious character of the Ten Commandments. *See Books*, 235 F.3d

at 303 (participation of minister, priest, and rabbi at dedi-
cation of monument "makes it clear that the purpose for
displaying the monument was not only to provide youths
with a common code of conduct to guide their participation
in the civil community but also to urge the people of Elkhart
to embrace the specific religious code of conduct taught by
the Ten Commandments"); *O'Bannon*, 259 F.3d at 771
(where the stated purpose of the monument was to remind
society of its "core values," the selection of a religious code
revealed the state's nonsecular purpose).

The same cannot be said of the "Foundations" exhibit at
issue here. The resolution authorizing the display says, in
reference to *all* the included documents: "[T]hese above
named documents and symbols positively contribute to the
educational foundation and moral character of the citizens
of this county." Unlike in *Books* and *O'Bannon*, where the
government highlighted the religious character of the monu-
ments, here Elkhart County has explicitly emphasized the
holistic character of its display.

Considered in this context, the reference to moral char-
acter in the Commission's resolution does not necessarily
imply a purpose to advance religion. Elkhart County has
not suggested that morality is impossible without adher-
ence to a particular religious text, or that adherence to a
specific religious text inspires a superior morality. These
would, no doubt, be religious messages. Rather, the County's
resolution says that instilling "a sense of historical context,
civic duty, and responsibility" in the citizenry is a desirable
goal, and that the documents in the display "*taken as a
whole*" are "valuable *examples* of documents and symbols
that *may* instill" these qualities. This sort of broad associa-
tion of the Ten Commandments with generally accepted
moral norms does not doom this display under the purpose
prong of *Lemon*.

As for the County's "educational foundation" purpose, the
district court found the historical content of the explanation

insufficient to sustain any bona fide secular educational purpose. The district court is correct that the explanation describes the historical connection between the Ten Commandments and the rest of the display in only the most general and conclusory terms: it states that the Ten Commandments have "profoundly influenced the formation of Western legal thought and the formation of our country" and provide the "moral background of the Declaration of Independence and the foundation of our legal system." But the explanatory text accompanying the other documents and images is also quite cursory. The explanation does not purport to offer a nuanced historical analysis of the documents individually or the exhibit as a whole.

The purpose prong of the *Lemon* test does not require us to evaluate the quality or sufficiency of the historical analysis embodied in the County's display. While the content of a religious display might in some instances force a conclusion that the government's asserted secular purpose is merely a sham, that is not the case here. This display is a collection of texts and images from English and American history. The County does not claim that they are the only or the most important sources of American law and politics, merely that they are among the most important. That a religious text has been included in a display of documents that have influenced American history and government does not take the display outside the realm of the secular: "It is true that religion has been closely identified with our history and government." *Abington*, 374 U.S. at 212.

We said in the first *Books* case that it is well within the bounds of constitutional plausibility to assert, as the County does here, that the Ten Commandments have played an important role in the development of American society and civic order. *Books*, 235 F.3d at 302. To reject this display as unconstitutional under the purpose prong of *Lemon* would amount to a conclusion that the County has failed to adequately demonstrate that historical thesis. We are not

willing to set ourselves up as arbiters of the adequacy of the historical analysis contained in documentary exhibits appearing on public grounds.

Were this display erected on the wall of a public museum, we would hardly think it appropriate to second-guess the museum's purposes by questioning the quality of the exhibit's historical content or substituting our own historical analysis for that of the curator. Placement in a museum might signal more clearly the exhibitor's educational purpose, as education is one of the primary functions of museums, but it is also entirely reasonable to accept that representative governments might credibly propose that their citizens learn something about their history, law, and culture inside the very buildings which house their government.

We do not hold that this display passes the purpose prong of the *Lemon* test merely because the Ten Commandments, a religious text, has been placed in a setting that includes secular texts. We noted in *O'Bannon* that "[t]he display of secular texts along with the Ten Commandments does not automatically lead to a finding that the purpose in erecting the monument is primarily secular." *O'Bannon*, 259 F.3d at 771. But the display in this case, taken as a whole, does not belie the County's asserted secular purpose of exhibiting important historical documents to contribute to the education and moral character of its citizens by instilling a sense of history, civic duty, and responsibility.

### 2.  Secular Effect

The second inquiry of the *Lemon* methodology asks whether the challenged government action has the principal or primary effect of advancing or inhibiting religion. *Lynch*, 465 U.S. at 679. The "effects" prong of *Lemon* has been refined to focus on whether the government action in question has the effect of endorsing religion: "[T]he effect prong asks

whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval." *Freedom from Religion Found.*, 203 F.3d at 493 (quoting *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring)). As with the test for secular purpose, we evaluate the effect of the challenged government action by "assessing the totality of the circumstances surrounding the display to determine whether a reasonable person would believe that the display amounts to an endorsement of religion." *Books*, 235 F.3d at 304 (citing *County of Allegheny*, 492 U.S. at 597).

The "courts have a special responsibility to ensure that a government-sponsored display does not have the purpose or effect of endorsing a religion." *Books*, 235 F.3d at 304. The Supreme Court has said that government sponsorship of a religious message is impermissible because "it sends the ancillary message to members of the audience who are nonadherents 'that they are outsiders, not full members of the political community, and the accompanying message to adherents that they are insiders, favored members of the political community.'" *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 309-10 (2000) (quoting *Lynch*, 465 U.S. at 688 (O'Connor, J., concurring)).

This does not mean, however, that to constitutionally display a religious item on public property the government must ensure that it offends no one. That would be asking the impossible. That some person or group might be uncomfortable with the presence of the Ten Commandments in this display is not enough to require their removal. "[T]he endorsement inquiry is not about the perceptions of particular individuals or saving isolated nonadherents from the discomfort of viewing symbols of faith to which they do not subscribe." *See Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 779 (1995) (O'Connor, J., concurring). The effect of a display of a religious object on public prop-

erty is evaluated against an objective, reasonable person standard, not from the standpoint of the hypersensitive or easily offended.

"Thus, 'we do not ask whether there is *any* person who could find an endorsement of religion, whether *some* people may be offended by the display, or whether *some* reasonable person might think [the State] endorses religion.' " *Id.* at 780 (quoting *Ams. United for Separation of Church & State v. Grand Rapids*, 980 F.2d 1538, 1544 (6th Cir. 1992) (en banc)). Rather, we ask whether an objective, reasonable observer, "aware of the history and context of the community and forum in which the religious display appears," would fairly understand the display to be a government endorsement of religion. *Id.*; *see also Santa Fe Indep. Sch. Dist.*, 530 U.S. at 308; *County of Allegheny*, 492 U.S. at 595. This standard presupposes a person of ordinary understanding and sensibility, familiar with the circumstances surrounding the display. *Santa Fe*, 530 U.S. at 308; *Books*, 235 F.3d at 306. "Every government practice must be judged in its unique circumstances to determine whether it constitutes an endorsement or disapproval of religion." *American Jewish Cong.*, 827 F.2d at 127 (quoting *Lynch*, 465 U.S. at 694 (O'Connor, J., concurring)).

Elkhart County's display is located inside the County's main administration building. It could hardly be closer to the seat of government, and we have previously indicated that religious displays on or near the seat of government must receive special scrutiny because that location is "so plainly under government ownership and control that every display on its property is marked implicitly with government approval." *Books*, 235 F.3d at 306 (quoting *American Jewish Cong.*, 827 F.2d at 128). The placement of this display so close to the County Commissioners' hearing room obviously signals the government's approval of it.

The Commission's approval of the "Foundations" display as a whole, however, does not amount to an endorsement of

the religious message contained in one of the nine historical documents included in the exhibit. This display differs in significant respects from the monuments we found constitutionally impermissible in *Books* and *O'Bannon.* In those cases, as here, we examined the form and content of the displays as well as their location at the seat of government. We concluded that the large stone monuments displayed so prominently on the grounds of the city municipal building (*Books*) and Indiana State Capitol (*O'Bannon*) had the primary effect of endorsing religion. *See Books*, 235 F.3d at 306 ("As viewed by the passer-by or by an individual approaching the building, the monument certainly cannot be fairly characterized as a component of a comprehensive display of the cultural heritage of the people of Elkhart."); *O'Bannon*, 259 F.3d at 773 ("Nothing in the context of the monument itself or the surrounding grounds mitigates the religious message conveyed.").

The particular factors we viewed as problematic in those cases are not present in the "Foundations" display. Here, the text of the Ten Commandments is displayed in a simple rectangular frame identical to the other documents and symbols in the exhibit, not on a tablet-shaped monument whose "very format," we previously held, "conveyed a religious message." *O'Bannon*, 259 F.3d at 772. Moreover, in *O'Bannon* we found that the placement of additional historical texts on different sides of the Ten Commandments monument inhibited observers from visually connecting the texts; here, in contrast, the documents are displayed in a way that does not direct an observer to focus on any one document. Furthermore, while the monument in *O'Bannon* lacked "any marker explaining why these particular texts have been combined," in this case the display includes a framed explanation of the historic significance of each of the documents. The content and context of the "Foundations" display, considered as a whole, suggest that the Ten Commandments are included not for their singular religious

import (that is, as a statement of religious imperatives) but, rather, for their historical contribution to the development of American legal and political traditions.

By virtue of the texts that are included and the content of the accompanying explanation, this display tells viewers that the American founders were inspired by a religious tradition that includes the Ten Commandments and that those values influenced the development of our law and government. A public acknowledgment by the government that the founders were religious people whose faith influenced the creation of this nation, its laws, and its institutions of government is far different from saying that the government itself endorses their religion. Only the latter message is prohibited by the Establishment Clause.

The Establishment Clause is not violated when government teaches about the historical role of religion. In a pluralistic society, reasonable people can usually tell the difference between preaching religion and teaching about the role of religion in our history. We are satisfied that Elkhart County is trying to teach, not preach, something about the Ten Commandments. The theme of the "Foundations" display is historical, emphasizing the origins of the American legal order; the historical thesis that underlies the display is that belief in God and the existence of inherent, God-given rights has played an important role in the genesis of basic concepts in American law and government.

"There is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789." *Lynch*, 465 U.S. at 674. Because we "'are a religious people whose institutions presuppose a Supreme Being' . . . [o]ur history is replete with official references to the value and invocation of Divine guidance in deliberations and pronouncements of the Founding Fathers and contemporary leaders." *Id.* at 675

(quoting *Zorach v. Clauson*, 343 U.S. 306, 313 (1952)). An objective, reasonable observer would see Elkhart County's "Foundations" display as consistent with this history and not as an endorsement of religion. Although we acknowledge the symbolic force of exhibiting a religious text at the seat of government, we conclude that the primary effect of this display is not the advancement of religion; a reasonable observer of the "Foundations" display will think history, not religion. *Cf. O'Bannon*, 259 F.3d at 773 ("A reasonable person [viewing the Ten Commandments monument] will think religion, not history.").

### III.  Conclusion

In the first *Books* case we said that the Ten Commandments "no doubt ha[ve] played a role in the secular development of our society and can no doubt be presented by the government as playing such a role in our civic order." *Books*, 235 F.3d at 302. It appears Elkhart County has taken us at our word by exhibiting the Ten Commandments in a comprehensive display along with other historical texts and images that it considers to be important influences in American legal and political tradition. We see no reason why the display as erected must be purged of the Ten Commandments to survive constitutional scrutiny. This is a secular display in its purpose and effect. The order of the district court is reversed and the case is remanded for entry of summary judgment for Elkhart County.

REVERSED AND REMANDED

EASTERBROOK, *Circuit Judge*, dissenting. My colleagues ask and answer the question whether inclusion of the Ten Commandments in a display at Elkhart's County Administration Building endorses religion and thus transgresses the establishment clause of the first amendment, applied to state and local governments by the fourteenth amendment. I have serious doubts about the nature of the question, even on the supposition that the establishment clause affects states in the same way as the national government. See *Elk Grove Unified School District v. Newdow*, 124 S. Ct. 2301, 2330-31 (2004) (Thomas, J., concurring). "Endorsement" differs from "establishment." A government does not "establish" milk as the national beverage when it endorses milk as part of a sound diet.

"Establishment" entails coercion: either mandatory religious observance or mandatory support (via taxes) for clergy on the public payroll. See Philip Hamburger, *Separation of Church and State* 89-107 (2002); Leonard W. Levy, *The Establishment Clause: Religion and the First Amendment* (1986); Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105 (2003); Michael W. McConnell, *Coercion: The Lost Element of Establishment*, 27 Wm. & Mary L. Rev. 933 (1986). See also *American Jewish Congress v. Chicago*, 827 F.2d 120, 128-40 (7th Cir. 1987) (Easterbrook, J., dissenting). Equating "endorsement" with "establishment" is a novelty with neither linguistic nor historical provenance. Our obligation to implement the Supreme Court's *holdings* does not require us to predict how an approach espoused by a few Justices, and applied unpredictably under a decision (*Lemon v. Kurtzman*, 403 U.S. 602 (1971)) that a majority of sitting Justices has disavowed (though never at the same time), would deal with a situation the Court has yet to address. We should use the Constitution's own language and rules.

Words do not coerce. See *Rust v. Sullivan*, 500 U.S. 173 (1991). A barrage of advertisements tempting young people

to join the military does not oblige anyone to do so; no more does display of the Ten Commandments coerce support for religion. The Magna Carta (which begins "John, by the grace of God, king of England . . .") is part of this display, yet Elkhart County does not establish divine-right monarchy. Lady Justice, derived from the Greek goddess Themis, is in the display, but Elkhart County has not established the ancient pantheon as its religion. No one would understand any document's presence in this display to suggest that Elkhart County imposes either legal or social sanctions on nonbelievers. Cf. *Santa Fe Independent School District v. Doe*, 530 U.S. 290, 310-13 (2000) (prayer before public high school event entails social disapproval of those who do not participate, and thus coerces religious conformity).

What the display may do is give offense, either to persons outside the religious tradition that includes the Book of Exodus or to those who believe that religion and government should be hermetically separated. Yet Themis may offend Christians (and all icons offend Muslims), the military's ads offend religious pacifists, and the message in *Rust* supports one religious perspective on human life while deprecating others. See also *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 881-87 (1992) (states may require physicians to tell women about the risks of abortion and the advantages of childbirth). Public policies and arguments pro and con about them often give offense, as do curricular choices in public schools. See *Webster v. New Lenox School District*, 917 F.2d 1004 (7th Cir. 1990). But the rebuke implied when a governmental body supports a point of view that any given person finds contemptible (or believes should be left to the private sector) is a great distance from "coercion." So great a distance, indeed, that the insulted person lacks standing to sue.

Just last Term the Court made that point in *Newdow* when holding that a father's dismay at knowing that public schools call on his daughter to recite "under God" in the Pledge of Allegiance does not support litigation. Only the

daughter—the person potentially coerced—or a custodial parent acting as her next friend could obtain judicial review. See also *Crowley v. McKinney*, No. 02-3741 (7th Cir. Mar. 11, 2005), slip op. 7-10. *Newdow* instantiates the rule announced in *Valley Forge Christian College v. Americans United For Separation of Church and State, Inc.*, 454 U.S. 464, 482-90 (1982), that offense taken at the government's complicity in religion does not create standing. Cf. *Allen v. Wright*, 468 U.S. 737 (1984). Otherwise there would be universal standing: anyone could contest any public policy or action he disliked. There must be a concrete injury. All our plaintiff alleges, however, is dismay at seeing the Ten Commandments.

Like other appellate courts, we have held that changing one's daily route to avoid coming across a religious display, or staying out of a park, is enough of a concrete effect to establish injury in fact. See, e.g., *ACLU v. St. Charles*, 794 F.2d 265, 267-69 (7th Cir. 1986); *Doe v. Crestwood*, 917 F.2d 1476, 1478 (7th Cir. 1990). Books does not contend that he has been driven out of the County Administration Building by the display. To the contrary, he alleges that he visits the building once a year to apply for a waiver of the excise tax on his car, and that he has *not* changed his conduct since the display was installed. Thus he alleges indignation *and nothing else*.

Several decisions of this circuit have reduced *Valley Forge* to a hollow shell, holding for example that it is enough to "allege standing" without establishing injury in fact, see *Harris v. Zion*, 927 F.2d 1401 (7th Cir. 1991), or that dismay while walking past a monument inscribed with the Ten Commandments is a cognizable injury, see *Books v. Elkhart*, 235 F.3d 292, 299-301 (7th Cir. 2000) (*Books I*). The approach taken by *Harris*, problematic at the outset, see 927 F.2d at 1419-22 (Easterbrook, J., dissenting), was disapproved in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-62 (1992), which holds that injury in fact must be proved and not just asserted. And the conclusion of *Books*

*I* that seeing an unwelcome object equals injury in fact is impossible to reconcile with *Valley Forge*, for it treats observation *simpliciter* as the injury. If that were right, the plaintiff in *Valley Forge* should have been allowed to litigate. What the Supreme Court held, however, is that "the psychological consequence presumably produced by *observation* of conduct with which one disagrees" (454 U.S. at 485) (emphasis added), is *not* an "injury in fact" for constitutional purposes.

Instead of following *Books I* we should overrule it as inconsistent with *Valley Forge*, a decision that *Books I* did not mention. Although *Newdow* devotes most of its attention to a prudential question about the effect of a child-custody decree, it starts with an assumption shared by all of the Justices: that Newdow's disgust at knowing that pupils recite the phrase "under God" was not enough to support constitutional litigation. "The command to guard jealously and exercise rarely our power to make constitutional pronouncements requires strictest adherence when matters of great national significance are at stake." 124 S. Ct. at 2308. That reflects an approach at odds with *Books I*, which assumed that judges should address constitutional grievances whether or not the plaintiff can show concrete injury.

Decisions such as *Books I* drain the case-or-controversy requirement of meaning. *Valley Forge* requires us to separate injured from ideological plaintiffs; *Books I* fails to do this. We should set things to rights rather than repeat the mistake. Therefore, unlike my colleagues, who resolve this appeal on the merits, I would vacate the district court's judgment and remand with instructions to dismiss the complaint for want of standing.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*