Justice Scalia,
with whom The Chief Justice and Justice Thomas join, and with whom Justice Kennedy joins as to Parts II and III,
dissenting.
I would uphold McCreary County and Pulaski County, Kentucky’s (hereinafter Counties) displays of the Ten Commandments. I shall discuss, first, why the Court’s oft repeated assertion that the government cannot favor religious practice is false; second, why today’s opinion extends the scope of that falsehood even beyond prior cases; and third, why even on the basis of the Court’s false assumptions the judgment here is wrong.
I
A
On September 11,2001,1 was attending in Rome, Italy, an international conference of judges and lawyers, principally from Europe and the United States. That night and the next morning virtually all of the participants watched, in their hotel rooms, the address to the Nation by the President of the United States concerning the murderous attacks upon the Twin Towers and the Pentagon, in which thousands of Americans had been killed. The address ended, as Presidential addresses often do, with the prayer “God bless America.” The next afternoon I was approached by one of the judges from a European country, who, after extending his profound condolences for my country’s loss, sadly observed: “How I wish that the Head of State of my country, at a similar time of national tragedy and distress, could conclude his address ‘God bless__’ It is of course absolutely forbidden.”
*886 That is one model of the relationship between church and state — a model spread across Europe by the armies of Napoleon, and reflected in the Constitution of France, which begins, “France is [a]... secular... Republic.” France Const., Art. 1, in 7 Constitutions of the Countries of the World, p. 1 (G. Flanz ed. 2000). Religion is to be strictly excluded from the public forum. This is not, and never was, the model adopted by America. George Washington added to the form of Presidential oath prescribed by Art. II, § 1, cl. 8, of the Constitution, the concluding words “so help me God.” See Blomquist, The Presidential Oath, the American National Interest and a Call for Presiprudence, 73 UMKC L. Rev. 1, 34 (2004). The Supreme Court under John Marshall opened its sessions with the prayer, “God save the United States and this Honorable Court.” 1 C. Warren, The Supreme Court in United States History 469 (rev. ed. 1926) (internal quotation marks omitted). The First Congress instituted the practice of beginning its legislative sessions with a prayer. Marsh v. Chambers, 463 U. S. 783, 787-788 (1983). The same week that Congress submitted the Establishment Clause as part of the Bill of Rights for ratification by the States, it enacted legislation providing for paid chaplains in the House and Senate. Id., at 788. The day after the First Amendment was proposed, the same Congress that had proposed it requested the President to proclaim “a day of public thanksgiving and prayer, to be observed, by acknowledging, with grateful hearts, the many signal favours of Almighty God.” H. R. Jour., 1st Cong., 1st Sess., 123 (1826 ed.); see also Sen. Jour., 1st Sess., 88 (1820 ed.). President Washington offered the first Thanksgiving Proclamation shortly thereafter, devoting November 26, 1789, on behalf of the American people “‘to the service of that great and glorious Being who is the beneficent author of all the good that was, that is, or that will be,’” Van Orden v. Perry, ante, at 687 (plurality opinion) (quoting President Washington’s first Thanksgiving Proclamation), thus beginning a tradition of offering gratitude to *887 God that continues today. See Wallace v. Jaffree, 472 U. S. 38, 100-103 (1985) (Rehnquist, J., dissenting).[1] The same Congress also reenacted the Northwest Territory Ordinance of 1787,1 Stat. 50, Article III of which provided: “Religion, morality, and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged.” Id., at 52, n. (a). And of course the First Amendment itself accords religion (and no other manner of belief) special constitutional protection.
These actions of our First President and Congress and the Marshall Court were not idiosyncratic; they reflected the beliefs of the period. Those who wrote the Constitution believed that morality was essential to the well-being of society and that encouragement of religion was the best way to foster morality. The “fact that the Founding Fathers believed devotedly that there was a God and that the unalienable rights of man were rooted in Him is clearly evidenced in their writings, from the Mayflower Compact to the Constitution itself.” School Dist. of Abington Township v. Schempp, 374 U. S. 203, 213 (1963). See Underkuffler-Freund, The Separation of the Religious and the Secular: A Foundational Challenge to First-Amendment Theory, 36 Wm. & Mary L. Rev. 837, 896-918 (1995). President Washington opened his Presidency with a prayer, see Inaugural Addresses of the Presidents of the United States 1, 2 (1989), and reminded his fellow citizens at the conclusion of it that “reason and experience both forbid us to expect that National morality can prevail in exclusion of rehgious principle,” Farewell Address (1796), reprinted in 35 Writings of George Washington 229 (J. Fitzpatrick ed. 1940). President John Adams wrote to the Massachusetts Militia, “we have no government *888 armed with power capable of contending with human passions unbridled by morality and religion. . . . Our Constitution was made only for a moral and religious people. It is wholly inadequate to the government of any other.” Letter (Oct. 11,1798), reprinted in 9 Works of John Adams 229 (C. Adams ed. 1971). Thomas Jefferson concluded his second inaugural address by inviting his audience to pray:
“I shall need, too, the favor of that Being in whose hands we are, who led our fathers, as Israel of old, from their native land and planted them in a country flowing with all the necessaries and comforts of life; who has covered our infancy with His providence and our riper years with His wisdom and power and to whose goodness I ask you to join in supplications with me that He will so enlighten the minds of your servants, guide their councils, and prosper their measures that whatsoever they do shall result in your good, and shall secure to you the peace, friendship, and approbation of all nations.” Inaugural Addresses of the Presidents of the United States, at 18, 22-23.
James Madison, in his first inaugural address, likewise placed his confidence “in the guardianship and guidance of that Almighty Being whose power regulates the destiny of nations, whose blessings have been so conspicuously dispensed to this rising Republic, and to whom we are bound to address our devout gratitude for the past, as well as our fervent supplications and best hopes for the future.” Id., at 25, 28.
Nor have the views of our people on this matter significantly changed. Presidents continue to conclude the Presidential oath with the words “so help me God.” Our legislatures, state and national, continue to open their sessions with prayer led by official chaplains. The sessions of this Court continue to open with the prayer “God save the United States and this Honorable Court.” Invocation of the Almighty by our public figures, at all levels of government, *889 remains commonplace. Our coinage bears the motto, “IN GOD WE TRUST.” And our Pledge of Allegiance contains the acknowledgment that we are a Nátion “under God.” As one of our Supreme Court opinions rightly observed, “We are a religious people whose institutions presuppose a Supreme Being.” Zorach v. Clauson, 343 U. S. 306, 313 (1952), repeated with approval in Lynch v. Donnelly, 465 U. S. 668, 675 (1984); Marsh, 463 U. S., at 792; Abington Township, supra, at 213.
With all of this reality (and much more) staring it in the face, how can the Court possibly assert that the “‘First Amendment mandates governmental neutrality between ... religion and nonreligion,’” ante, at 860, and that “[m]ani-festing a purpose to favor . . . adherence to religion generally,” ibid., is unconstitutional? Who says so? Surely not the words of the Constitution. Surely not the history and traditions that reflect our society’s constant understanding of those words. Surely not even the current sense of our society, recently reflected in an Act of Congress adopted unanimously by the Senate and with only five nays in the House of Representatives, see 148 Cong. Rec. 12041 (June 28, 2002); id., at 19518 (Oct. 8, 2002), criticizing a Court of Appeals opinion that had held “under God” in the Pledge of Allegiance unconstitutional. See Act of Nov. 13, 2002, §§ 1(9), 2(a), 3(a), 116 Stat. 2057, 2058, 2060-2061 (reaffirming the Pledge of Allegiance and the National Motto (“In God We Trust”) and stating that the Pledge of Allegiance is “clearly consistent with the text and intent of the Constitution”). Nothing stands behind the Court’s assertion that governmental affirmation of the society’s belief in God is unconstitutional except the Court’s own say-so, citing as support only the unsubstantiated say-so of earlier Courts going back no further than the mid-20th century. See ante, at 860, citing Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos, 483 U. S. 327, 335 (1987), in turn citing Lemon v. Kurtzman, 403 U. S. 602, 612 (1971), in *890 turn citing Board of Ed. of Central School Dist. No. 1 v. Allen, 392 U. S. 236, 243 (1968), in turn quoting Abington Township, 374 U. S., at 222, in turn citing Everson v. Board of Ed. of Ewing, 330 U. S. 1, 15 (1947).[2] And it is, moreover, a thoroughly discredited say-so. It is discredited, to begin with, because a majority of the Justices on the current Court (including at least one Member of today’s majority) have, in separate opinions, repudiated the brain-spun “Lemon test” that embodies the supposed principle of neutrality between religion and irreligión. See Lamb’s Chapel v. Center Moriches Union Free School Dist., 508 U. S. 384, 398-399 (1993) (Scalia, J., concurring in judgment) (collecting criticism of Lemon); Van Orden, ante, at 692-693, 697 (Thomas, J., concurring); Board of Ed. of Kiryas Joel Village School Dist. v. Grumet, 512 U. S. 687, 720 (1994) (O’Connor, J., concurring in part and concurring in judgment); County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter, 492 U. S. 573, 655-656, 672-673 (1989) (KENNEDY, J., concurring in judgment in part and dissenting in part); Wallace, 472 U. S., at 112 (Rehnquist, J., dissenting); see also Committee for Public Ed. and Religious Liberty v. Regan, 444 U. S. 646, 671 (1980) (Stevens, J., dissenting) (disparaging “the sisyphean task of trying to patch together the blurred, indistinct, and variable barrier’ described in Lemon”). And it is discredited because the Court has not had the courage (or the foolhardiness) to apply the neutrality principle consistently.
What distinguishes the rule of law from the dictatorship of a shifting Supreme Court majority is the absolutely indis *891 pensable requirement that judicial opinions be grounded in consistently applied principle. That is what prevents judges from ruling now this way, now that — thumbs up or thumbs down — as their personal preferences dictate. Today’s opinion forthrightly (or actually, somewhat less than forthrightly) admits that it does not rest upon consistently applied principle. In a revealing footnote, ante, at 859-860, n. 10, the Court acknowledges that the “Establishment Clause doctrine” it purports to be applying “lacks the comfort of categorical absolutes.” What the Court means by this lovely euphemism is that sometimes the Court chooses to decide cases on the principle that government cannot favor religion, and sometimes it does not. The footnote goes on to say that “[i]n special instances we have found good reason” to dispense with the principle, but “[n]o such reasons present themselves here.” Ibid. It does not identify all of those “special instances,” much less identify the “good reason” for their existence.
I have cataloged elsewhere the variety of circumstances in which this Court — even after its embrace of Lemon’s stated prohibition of such behavior — has approved government action “undertaken with the specific intention of improving the position of religion,” Edwards v. Aguillard, 482 U. S. 578, 616 (1987) (Scalia, J., dissenting). See id., at 616-618. Suffice it to say here that when the government relieves churches from the obligation to pay property taxes, when it allows students to absent themselves from public school to take religious classes, and when it exempts religious organizations from generally applicable prohibitions of religious discrimination, it surely means to bestow a benefit on religious practice — but we have approved it. See Amos, supra, at 338 (exemption from federal prohibition of religious discrimination by employers); Walz v. Tax Comm’n of City of New York, 397 U. S. 664, 673 (1970) (property tax exemption for church property); Zorach, supra, at 308, 315 (law permitting students to leave public school for the purpose of *892 receiving religious education). Indeed, we have even approved (post-Lemon) government-led prayer to God. In Marsh v. Chambers, the Court upheld the Nebraska State Legislature’s practice of paying a chaplain to lead it in prayer at the opening of legislative sessions. The Court explained that “[t]o invoke Divine guidance on a public body entrusted with making the laws is not... an ‘establishment’ of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country.” 463 U. S., at 792. (Why, one wonders, is not respect for the Ten Commandments a tolerable acknowledgment of beliefs widely held, among the people of this country?)
The only “good reason” for ignoring the neutrality principle set forth in any of these cases was the antiquity of the practice at issue. See id., at 786-792, 794; Walz, supra, at 676-680. That would be a good reason for finding the neutrality principle a mistaken interpretation of the Constitution, but it is hardly a good reason for letting an unconstitutional practice continue. We did not hide behind that reason in Reynolds v. Sims, 377 U. S. 533 (1964), which found unconstitutional bicameral state legislatures of a sort that had existed since the beginning of the Republic. And almost monthly, it seems, the Court has not shrunk from invalidating aspects of criminal procedure and penology of similar vintage. See, e. g., Deck v. Missouri, 544 U. S. 622, 633 (2005) (invalidating practice of shackling defendants absent “special circumstances”); id., at 641-645 (Thomas, J., dissenting); Roper v. Simmons, 543 U. S. 551, 568 (2005) (invalidating practice of executing under-18-year-old offenders); id., at 611, n. 2 (Scalia, J., dissenting). What, then, could be the genuine “good reason” for occasionally ignoring the neutrality principle? I suggest it is the instinct for self-preservation, and the recognition that the Court, which “has no influence over either the sword or the purse,” The Federalist No. 78, p. 412 (J. Pole ed. 2005) (A. Hamilton), cannot go *893 too far down the road of an enforced neutrality that contradicts both historical fact and current practice without losing all that sustains it: the willingness of the people to accept its interpretation of the Constitution as definitive, in preference to the contrary interpretation of the democratically elected branches.
Besides appealing to the demonstrably false principle that the government cannot favor religion over irreligión, today’s opinion suggests that the posting of the Ten Commandments violates the principle that the government cannot favor one religion over another. See ante, at 868; see also Van Orden, ante, at 717-718 (Stevens, J., dissenting). That is indeed a valid principle where public aid or assistance to religion is concerned, see Zelman v. Simmons-Harris, 536 U. S. 639, 652 (2002), or where the free exercise of religion is at issue, Church of Lukumi Babalu Aye, Inc. v. Hialeah, 508 U. S. 520, 532-533 (1993); id., at 557-558 (Scalia, J., concurring in part and concurring in judgment), but it necessarily applies in a more limited sense to public acknowledgment of the Creator. If religion in the public forum had to be entirely nondenominational, there could be no religion in the public forum at all. One cannot say the word “God,” or “the Almighty,” one cannot offer public supplication or thanksgiving, without contradicting the beliefs of some people that there are many gods, or that God or the gods pay no attention to human affairs. With respect to public acknowledgment of religious belief, it is entirely clear from our Nation’s historical practices that the Establishment Clause permits this disregard of polytheists and believers in unconcerned deities, just as it permits the disregard of devout atheists. The Thanksgiving Proclamation issued by George Washington at the instance of the First Congress was scrupulously nondenominational — but it was monotheistic.[3] In Marsh v. *894 Chambers, supra, we said that the fact the particular prayers offered in the Nebraska Legislature were “in the Judeo-Christian tradition,” id., at 793, posed no additional problem, because “there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief,” id., at 794-795.
Historical practices thus demonstrate that there is a distance between the acknowledgment of a single Creator and the establishment of a religion. The former is, as Marsh v. Chambers put it, “a tolerable acknowledgment of beliefs widely held among the people of this country.” Id., at 792. The three most popular religions in the United States, Christianity, Judaism, and Islam — which combined account for 97.7% of all believers — are monotheistic. See U. S. Dept. of Commerce, Bureau of Census, Statistical Abstract of the United States: 2004-2005, p. 55 (124th ed. 2004) (Table No. 67). All of them, moreover (Islam included), believe that the Ten Commandments were given by God to Moses, and are divine prescriptions for a virtuous life. See 13 Encyclopedia of Religion 9074 (2d ed. 2005); The Qur’an 104 (M. Haleem transl. 2004). Publicly honoring the Ten Commandments is thus indistinguishable, insofar as discriminating against other religions is concerned, from publicly honoring God. Both practices are recognized across such a broad and diverse range of the population — from Christians to Muslims — that they cannot be reasonably understood as a government endorsement of a particular religious viewpoint.[4]
*895 B
A few remarks are necessary in response to the criticism of this dissent by the Court, as well as Justice Stevens’ criticism in the related case of Van Orden v. Perry, ante, p. 707. Justice Stevens’ writing is largely devoted to an attack upon a straw man. “[R]eliance on early religious proclamations and statements made by the Founders is . . . problematic,” he says, “because those views were not espoused at the Constitutional Convention in 1787 nor enshrined in the Constitution’s text.” Van Orden, ante, at 724 (dissenting opinion) (footnote omitted). But I have not relied upon (as he and the Court in this case do) mere “proclamations and statements” of the Founders. I have relied primarily upon official acts and official proclamations of the United States or of the component branches of its Government, including the First Congress’s beginning of the tradition of legislative prayer to God, its appointment of congressional chaplains, its legislative proposal of a Thanksgiving Proclamation, and its reenactment of the Northwest Territory Ordinance; our first President’s issuance of a Thanksgiving Proclamation; and invocation of God at the opening of sessions of the Supreme Court. The only mere “proclamations and statements” of the Founders I have relied upon were statements of Founders who occupied federal office, and spoke in at least a quasi-official capacity — Washington’s prayer at the opening of his Presidency and his Farewell Address, President John Adams’ letter to the Massachusetts Militia, and Jefferson’s and Madison’s inaugural addresses. The Court and Justice Stevens, by contrast, appeal to no official or even quasi-official action in support of their view of the Establishment Clause — only James Madison’s Memorial and Remonstrance Against Religious Assessments, written before the Federal Constitution had even been proposed, *896 two letters written by Madison long after he was President, and the quasi-official inaction of Thomas Jefferson in refusing to issue a Thanksgiving Proclamation. See ante, at 878-879; Van Orden, ante, at 724-725 (Stevens, J., dissenting). The Madison Memorial and Remonstrance, dealing as it does with enforced contribution to religion rather than public acknowledgment of God, is irrelevant; one of the letters is utterly ambiguous as to the point at issue here, and should not be read to contradict Madison’s statements in his first inaugural address, quoted earlier; even the other letter does not disapprove public acknowledgment of God, unless one posits (what Madison’s own actions as President would contradict) that reference to God contradicts “the equality of all religious sects.” See Letter from James Madison to Edward Livingston (July 10, 1822), in 5 The Founders’ Constitution 105-106 (P. Kurland & R. Lerner eds. 1987). And as to Jefferson: The notoriously self-contradicting Jefferson did not choose to have his nonauthorship of a Thanksgiving Proclamation inscribed on his tombstone. What he did have inscribed was his authorship of the Virginia Statute for Religious Freedom, a governmental act which begins “Whereas, Almighty God hath created the mind free . . . .” Va. Code Ann. § 57-1 (Lexis 2003).
It is no answer for Justice Stevens to say that the understanding that these official and quasi-official actions reflect was not “enshrined in the Constitution’s text.” Van Orden, ante, at 724 (dissenting opinion). The Establishment Clause, upon which Justice Stevens would rely, was enshrined in the Constitution’s text, and these official actions show what it meant. There were doubtless some who thought it should have a broader meaning, but those views were plainly rejected. Justice Stevens says that reliance on these actions is “bound to paint a misleading picture,” ibid., but it is hard to see why. What is more probative of the meaning of the Establishment Clause than the actions of *897 the very Congress that proposed it, and of the first President charged with observing it?
Justice Stevens also appeals to the undoubted fact that some in the founding generation thought that the Religion Clauses of the First Amendment should have a narrower meaning, protecting only the Christian religion or perhaps only Protestantism. See Van Orden, ante, at 725-728. I am at a loss to see how this helps his case, except by providing a cloud of obfuscating smoke. (Since most thought the Clause permitted government invocation of monotheism, and some others thought it permitted government invocation of Christianity, he proposes that it be construed not to permit any government invocation of religion at all.) At any rate, those narrower views of the Establishment Clause were as clearly rejected as the more expansive ones. Washington’s First Thanksgiving Proclamation is merely an example. All of the actions of Washington and the First Congress upon which I have relied, virtually all Thanksgiving Proclamations throughout our history,[5] and all the other examples of our Government’s favoring religion that I have cited, have invoked God, but not Jesus Christ.[6] Rather than relying *898 upon Justice Stevens’ assurance that “[t]he original understanding of the type of ‘religion’ that qualified for constitutional protection under the Establishment Clause likely did not include ... followers of Judaism and Islam,” Van Orden, ante, at 728; see also ante, at 880,1 would prefer to take the word of George Washington, who, in his famous Letter to the Hebrew Congregation of Newport, Rhode Island, wrote:
“All possess alike liberty of conscience and immunities of citizenship. It is now no more that toleration is spoken of, as if it was by the indulgence of one class of people, that another enjoyed the exercise of their inherent natural rights.” 6 The Papers of George Washington, Presidential Series 285 (D. Twohig ed. 1996).
The letter concluded, by the way, with an invocation of the one God:
“May the father of all mercies scatter light and not darkness in our paths, and make us all in our several vocations useful here, and in his own due time and way everlastingly happy.” Ibid.
Justice Stevens says that if one is serious about following the original understanding of the Establishment Clause, he must repudiate its incorporation into the Fourteenth Amendment, and hold that it does not apply against the States. See Van Orden, ante, at 729-731 (dissenting opinion). This is more smoke. Justice Stevens did not feel that way last Term, when he joined an opinion insisting upon the original meaning of the Confrontation Clause, but nonetheless applying it against the State of Washington. See Crawford v. Washington, 541 U. S. 36 (2004). The notion that incorporation empties the incorporated provisions of their original meaning has no support in either reason or precedent.
*899 Justice Stevens argues that original meaning should not be the touchstone anyway, but that we should rather “ex-poun[d] the meaning of constitutional provisions with one eye toward our Nation’s history and the other fixed on its democratic aspirations.” Van Orden, ante, at 732 (dissenting opinion). This is not the place to debate the merits of the “living Constitution,” though I must observe that Justice Stevens’ quotation from McCulloch v. Maryland, 4 Wheat. 316, 407 (1819), refutes rather than supports that approach.[7] Even assuming, however, that the meaning of the Constitution ought to change according to “democratic aspirations,” why are those aspirations to be found in Justices’ notions of what the Establishment Clause ought to mean, rather than in the democratically adopted dispositions of our current society? As I have observed above, numerous provisions of our laws and numerous continuing practices of our people demonstrate that the government’s invocation of God (and hence the government’s invocation of the Ten Commandments) is unobjectionable — including a statute enacted by Congress almost unanimously less than three years ago, stating that “under God” in the Pledge of Allegiance is constitutional, see 116 Stat. 2058. To ignore all this is not to give effect to “democratic aspirations” but to frustrate them.
Finally, I must respond to Justice Stevens’ assertion that I would “marginaliz[e] the belief systems of more than 7 million Americans” who adhere to religions that are not monotheistic. Van Orden, ante, at 719, n. 18 (dissenting opinion). Surely that is a gross exaggeration. The beliefs of those citizens are entirely protected by the Free Exercise Clause, and by those aspects of the Establishment Clause that do not relate to government acknowledgment of the Creator. Invocation of God despite their beliefs is permitted not because nonmonotheistic religions cease to be religions recognized by the Religion Clauses of the First
*900 Amendment, but because governmental invocation of God is not an establishment. Justice Stevens fails to recognize that in thé context of public acknowledgments of God there are legitimate competing interests: On the one hand, the interest of that minority in not feeling “excluded”; but on the other, the interest of the overwhelming majority of religious believers in being able to give God thanks and supplication as a people, and with respect to our national endeavors. Our national tradition has resolved that conflict in favor of the majority.[8] It is not for this Court to change a disposition that accounts, many Americans think, for the phenomenon remarked upon in a quotation attributed to various authors, including Bismarck, but which I prefer to associate with Charles de Gaulle: “God watches over little children, drunkards, and the United States of America.”
II
As bad as the Lemon test is, it is worse for the fact that, since its inception, its seemingly simple mandates have been manipulated to fit whatever result the Court aimed to achieve. Today’s opinion is no different. In two respects it modifies Lemon to ratchet up the Court’s hostility to religion. First, the Court justifies inquiry into legislative purpose, not as an end itself, but as a means to ascertain the appearance of the government action to an “‘objective observer.’” Ante, at 862. Because in the Court’s view the true danger to be guarded against is that the objective observer would feel like an “‘outside[r]’” or “‘not [a] full mem-be[r] of the political community,’ ” its inquiry focuses not on *901 the actual purpose of government action, but the “purpose apparent from government action.” Ante, at 860. Under this approach, even if a government could show that its actual purpose was not to advance religion, it would presumably violate the Constitution as long as the Court’s objective observer would think otherwise. See Capitol Square Review and Advisory Bd. v. Pinette, 515 U. S. 753, 776-777 (1995) (O’Connor, J., concurring in part and concurring in judgment) (stating that “when the reasonable observer would view a government practice as endorsing religion,... it is our duty to hold the practice invalid,” even if the law at issue was neutral and the benefit conferred on the religious entity was incidental).
I have remarked before that it is an odd jurisprudence that bases the unconstitutionality of a government practice that does not actually advance religion on the hopes of the government that it would do so. See Edwards, 482 U. S., at 639. But that oddity pales in comparison to the one invited by today’s analysis: the legitimacy of a government action with a wholly secular effect would turn on the misperception of an imaginary observer that the government officials behind the action had the intent to advance religion.
Second, the Court replaces Lemon’s requirement that the government have “a secular . . . purpose,” 403 U. S., at 612 (emphasis added), with the heightened requirement that the secular purpose “predominate” over any purpose to advance religion. Ante, at 864-865. The Court treats this extension as a natural outgrowth of the longstanding requirement that the government’s secular purpose not be a sham, but simple logic shows the two to be unrelated. If the government’s proffered secular purpose is not genuine, then the government has no secular purpose at all. The new demand that secular purpose predominate contradicts Lemon’s more limited requirement, and finds no support in our cases. In all but one of the five cases in which this Court has invalidated a government practice on the basis of its purpose to *902 benefit religion, it has first declared that the statute was motivated entirely by the desire to advance religion. See Santa Fe Independent School Dist. v. Doe, 530 U. S. 290, 308-309 (2000) (dismissing the school district’s proffered secular purposes as shams); Wallace, 472 U. S., at 56 (finding “no secular purpose” (emphasis in original)); Stone v. Graham, 449 U. S. 39, 41 (1980) (per curiam) (finding that “Kentucky’s statute requiring the posting of the Ten Commandments in public school rooms has no secular legislative purpose” (emphasis added)); Epperson v. Arkansas, 393 U. S. 97, 107-109 (1968). In Edwards, supra, the Court did say that the state action was invalid because its “primary” or “preeminent” purpose was to advance a particular religious belief, 482 U. S., at 590, 593,594, but that statement was unnecessary to the result, since the Court rejected the State’s only proffered secular purpose as a sham. See id., at 589.
I have urged that Lemon’s purpose prong be abandoned, because (as I have discussed in Part I) even an exclusive purpose to foster or assist religious practice is not necessarily invalidating. But today’s extension makes things even worse. By shifting the focus of Lemon’s purpose prong from the search for a genuine, secular motivation to the hunt for a predominantly religious purpose, the Court converts what has in the past been a fairly limited inquiry into a rigorous review of the full record.[9] Those responsible for the *903 adoption of the Religion Clauses would surely regard it as a bitter irony that the religious values they designed those Clauses to protect have now become so distasteful to this Court that if they constitute anything more than a subordinate motive for government action they will invalidate it.
Ill
Even accepting the Court’s Lemow-based premises, the displays at issue here were constitutional.
A
To any person who happened to walk down the hallway of the McCreary or Pulaski County Courthouse during the roughly nine months when the Foundations Displays were exhibited, the displays must have seemed unremarkable — if indeed they were noticed at all. The walls of both courthouses were already lined with historical documents and other assorted portraits; each Foundations Display was exhibited in the same format as these other displays and nothing in the record suggests that either County took steps to give it greater prominence.
Entitled “The Foundations of American Law and Government Display,” each display consisted of nine equally sized documents: the original version of the Magna Carta, the Declaration of Independence, the Bill of Rights, the Star Spangled Banner, the Mayflower Compact of 1620, a picture of Lady Justice, the National Motto of the United States (“In God We Trust”), the Preamble to the Kentucky Constitution, and the Ten Commandments. The displays did not emphasize any of the nine documents in any way: The frame holding the Ten Commandments was of the same size and had the *904 same appearance as that which held each of the other documents. See 354 F. 3d 438, 443 (CA6 2003).
Posted with the documents was a plaque, identifying the display, and explaining that it “‘contains documents that played a significant role in the foundation of our system of law and government.’” Ibid. The explanation related to the Ten Commandments was third in the list of nine and did not serve to distinguish it from the other documents. It stated:
“ ‘The Ten Commandments have profoundly influenced the formation of Western legal thought and the formation of our country. That influence is clearly seen in the Declaration of Independence, which declared that, “We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the pursuit of Happiness.” The Ten Commandments provide the moral background of the Declaration of Independence and the foundation of our legal tradition.’” Ibid.

B

On its face, the Foundations Displays manifested the purely secular purpose that the Counties asserted before the District Court: “to display documents that played a significant role in the foundation of our system of law and government.” Affidavit of Judge Jimmie Green in Support of Defendants’ Opposition to Plaintiffs’ Motion for Contempt or, in the Alternative, for Supplemental Preliminary Injunction in Civ. Action No. 99-507 (ED Ky.), p. 2, ¶4, App. 57. That the displays included the Ten Commandments did not transform their apparent secular purpose into one of impermissible advocacy for Judeo-Christian beliefs. Even an isolated display of the Decalogue conveys, at worst, “an equivocal message, perhaps of respect for Judaism, for religion in general, or for law.” Allegheny County, 492 U. S., at 652 (Stevens, J., *905 concurring in part and dissenting in part). But when the Ten Commandments appear alongside other documents of secular significance in a display devoted to the foundations of American law and government, the context communicates that the Ten Commandments are included, not to teach their binding nature as a religious text, but to show their unique contribution to the development of the legal system. See id., at 652-653. This is doubly true when the display is introduced by a document that informs passersby that it “ ‘contains documents that played a significant role in the foundation of our system of law and government.’ ” 354 F. 3d, at 443.
The same result follows if the Ten Commandments display is viewed in light of the government practices that this Court has countenanced in the past. The acknowledgment of the contribution that religion in general, and the Ten Commandments in particular, have made to our Nation’s legal and governmental heritage is surely no more of a step toward establishment of religion than was the practice of legislative prayer we approved in Marsh v. Chambers, 463 U. S. 783 (1983), and it seems to be on par with the inclusion of a creche or a menorah in a “Holiday” display that incorporates other secular symbols, see Lynch v. Donnelly, 465 U. S., at 679-680; Allegheny County, supra, at 621 (Blackmun, J., concurring in part and dissenting in part). The parallels between this case and Marsh and Lynch are sufficiently compelling that they ought to decide this case, even under the Court’s misguided Establishment Clause jurisprudence.[10]
*906 Acknowledgment of the contribution that religion has made to our Nation’s legal and governmental heritage partakes of a centuries-old tradition. Members of this Court have themselves often detailed the degree to which religious belief pervaded the National Government during the founding era. See Lynch, supra, at 674-678; Marsh, supra, at 786-788; Lee v. Weisman, 505 U. S. 577, 683-636 (1992) (Scalia, J., dissenting); Wallace, 472 U. S., at 100-106 (Rehnquist, J., dissenting); Engel v. Vitale, 370 U. S. 421, 446-450, and n. 3 (1962) (Stewart, J., dissenting). Display of the Ten Commandments is well within the mainstream of this practice of acknowledgment. Federal, state, and local governments across the Nation have engaged in such display.[11] The Supreme Court Building itself includes depictions of Moses with the Ten Commandments in the Courtroom and on the east pediment of the building, and symbols of the Ten Commandments “adorn the metal gates lining the north and south sides of the Courtroom as well as the doors leading into the Courtroom.” Van Orden, ante, at 688 (plurality opinion). Similar depictions of the Decalogue appear *907 on public buildings and monuments throughout our Nation’s Capital. Ante, at 689. The frequency of these displays testifies to the popular understanding that the Ten Commandments are a foundation of the rule of law, and a symbol of the role that religion played, and continues to play, in our system of government.
Perhaps in recognition of the centrality of the Ten Commandments as a widely recognized symbol of religion in public life, the Court is at pains to dispel the impression that its decision will require governments across the country to sandblast the Ten Commandments from the public square. See ante, at 874. The constitutional problem, the Court says, is with the Counties’ purpose in erecting the Foundations Displays, not the displays themselves. The Court adds in a footnote: “One consequence of taking account of the purpose underlying past actions is that the same government action may be constitutional if taken in the first instance and unconstitutional if it has a sectarian heritage.” Ante, at 866, n. 14.
This inconsistency may be explicable in theory, but I suspect that the “objective observer” with whom the Court is so concerned will recognize its absurdity in practice. By virtue of details familiar only to the parties to litigation and their lawyers, McCreary and Pulaski Counties, Kentucky, and Rutherford County, Tennessee, have been ordered to remove the same display that appears in courthouses from Mercer County, Kentucky, to Elkhart County, Indiana. Compare American Civil Liberties Union of Tenn. v. Rutherford County, 209 F. Supp. 2d 799, 808-809 (MD Tenn. 2002) (holding Foundations Display to be unconstitutional based on prior actions of county commission), with Books v. Elkhart County, 401 F. 3d 857, 869 (CA7 2005) (sustaining Foundations Display as “secular ... in its purpose and effect”); American Civil Liberties Union of Ky. v. Mercer County, 219 F. Supp. 2d 777, 787-789 (ED Ky. 2002) (rejecting Establishment Clause challenge to an identical Foundations Display and distinguishing McCreary County on the ground *908 that the County’s purpose had not been “tainted with any prior history”). Displays erected in silence (and under the direction of good legal advice) are permissible, while those hung after discussion and debate are deemed unconstitutional. Reduction of the Establishment Clause to such minutiae trivializes the Clause’s protection against religious establishment; indeed, it may inflame religious passions by making the passing comments of every government official the subject of endless litigation.
C
In any event, the Court’s conclusion that the Counties exhibited the Foundations Displays with the purpose of promoting religion is doubtful. In the Court’s view, the impermissible motive was apparent from the initial displays of the Ten Commandments all by themselves: When that occurs, the Court says, “a religious object is unmistakable.” Ante, at 869. Surely that cannot be. If, as discussed above, the Commandments have a proper place in our civic history, even placing them by themselves can be civically motivated — especially when they are placed, not in a school (as they were in the Stone case upon which the Court places such reliance), but in a courthouse. Cf. Van Orden, ante, at 701 (Breyer, J., concurring in judgment) (“The circumstances surrounding the display’s placement on the capítol grounds and its physical setting suggest that the State itself intended the . . . nonreligious aspects of the tablets’ message to predominate”). And the fact that at the posting of the exhibit a clergyman was present is unremarkable (clergymen taking particular pride in the role of the Ten Commandments in our civic history); and even more unremarkable the fact that the clergyman “testified to the certainty of the existence of God,” ante, at 869.
The Court has in the past prohibited government actions that “proselytize or advance any one, or . . . disparage any other, faith or belief,” Marsh, 463 U. S., at 794-795, or that apply some level of coercion (though I and others have dis *909 agreed about the form that coercion must take), see, e. g., Lee v. Weisman, 505 U. S., at 592 (prayer at high-school graduation invalid because of “subtle coercive pressure”); id., at 642 (Scalia, J., dissenting). The passive display of the Ten Commandments, even standing alone, does not begin to do either. What Justice Kennedy said of the creche in Allegheny County is equally true of the Counties’ original Ten Commandments displays:
“No one was compelled to observe or participate in any religious ceremony or activity. [T]he count[ies] [did not] contribute] significant amounts of tax money to serve the cause of one religious faith. [The Ten Commandments] are purely passive symbols of [the religious foundation for many of our laws and governmental institutions]. Passersby who disagree with the message conveyed by th[e] displays are free to ignore them, or even to turn their backs, just as they are free to do when they disagree with any other form of government speech.” 492 U. S., at 664 (opinion concurring in judgment in part and dissenting in part).
Nor is it the case that a solo display of the Ten Commandments advances any one faith. They are assuredly a religious symbol, but they are not so closely associated with a single religious belief that their display can reasonably be understood as preferring one religious sect over another. The Ten Commandments are recognized by Judaism, Christianity, and Islam alike as divinely given. See 13 Encyclopedia of Religion 9074 (2d ed. 2005).[12]
*910 The Court also points to the Counties’ second displays, which featured a number of statements in historical documents reflecting a religious influence, and the resolutions that accompanied their erection, as evidence of an impermissible religious purpose.[13] In the Court’s view, “[t]he [second] display’s unstinting focus ... on religious passages, show[s] that the Counties were posting the Commandments precisely because of their sectarian content.” Ante, at 870. No, all it necessarily shows is that the exhibit was meant to focus upon the historic role of religious belief in our national life— which is entirely permissible. And the same can be said of the resolution. To forbid any government focus upon this aspect of our history is to display what Justice Goldberg called “untutored devotion to the concept of neutrality,” Abington Township, 374 U. S., at 306 (concurring opinion), that would commit the Court (and the Nation) to a revisionist agenda of secularization.
*911 Turning at last to the displays actually at issue in this case, the Court faults the Counties for not repealing the resolution expressing what the Court believes to be an impermissible intent. Under these circumstances, the Court says, “[n]o reasonable observer could swallow the claim that the Counties had cast off the objective so unmistakable in the earlier displays.” Ante, at 872. Even were I to accept all that the Court has said before, I would not agree with that assessment. To begin with, of course, it is unlikely that a reasonable observer would even have been aware of the resolutions, so there would be nothing to “cast off.” The Court implies that the Counties may have been able to remedy the “taint” from the old resolutions by enacting a new one. See ante, at 871-872. But that action would have been wholly unnecessary in light of the explanation that the Counties included with the displays themselves: A plaque next to the documents informed all who passed by that each display “contains documents that played a significant role in the foundation of our system of law and government.” Additionally, there was no reason for the Counties to repeal or repudiate the resolutions adopted with the hanging of the second displays, since they related only to the second displays. After complying with the District Court’s order to remove the second displays “immediately,” and erecting new displays that in content and by express assertion reflected a different purpose from that identified in the resolutions, the Counties had no reason to believe that their previous resolutions would be deemed to be the basis for their actions.[14] After the Coun *912 ties discovered that the sentiments expressed in the resolutions could be attributed to their most recent displays (in oral argument before this Court), they repudiated them immediately.
In sum: The first displays did not necessarily evidence an intent to further religious practice; nor did the second displays, or the resolutions authorizing them; and there is in any event no basis for attributing whatever intent motivated the first and second displays to the third. Given the presumption of regularity that always accompanies our review of official action, see n. 9, supra, the Court has identified no evidence of a purpose to advance religion in a way that is inconsistent with our cases. The Court may well be correct in identifying the third displays as the fruit of a desire to display the Ten Commandments, ante, at 872, but neither our cases nor our history support its assertion that such a desire renders the fruit poisonous.
* * *
For the foregoing reasons, I would reverse the judgment of the Court of Appeals.

 See, e. g., President’s Thanksgiving Day 2004 Proclamation (Nov. 28, 2004), available at http://www.whitehouse.gov/news/releases/2004/ll/ 20041123-4.html (all Internet materials as visited June 24,2005, and available in Clerk of Court’s case file).

 The fountainhead of this jurisprudence, Everson v. Board of Ed. of Ewing, based its dictum that “[nleither a state nor the Federal Government. . . can pass laws which ... aid all religions,” 330 U. S., at 15, on a review of historical evidence that focused on the debate leading up to the passage of the Virginia Bill for Religious Liberty, see id., at 11-13. A prominent commentator of the time remarked (after a thorough review of the evidence himself) that it appeared the Court had been “sold... a bill of goods.” Corwin, The Supreme Court as National School Board, 14 Law & Contemp. Prob. 3, 16 (1949).

 The Court thinks it “surpris[ingl” and “truly . . . remarkable” to believe that “the deity the Framers had in mind” (presumably in all the instances of invocation of the deity I have cited) “was the God of monothe *894 ism.” Ante, at 879. This reaction would be more comprehensible if the Court could suggest what other God (in the singular, and with a capital G) there is, other than “the God of monotheism.” This is not necessarily the Christian God (though if it were, one would expect Christ regularly to be invoked, which He is not); but it is inescapably the God of monotheism.

 This is not to say that a display of the Ten Commandments could never constitute an impermissible endorsement of a particular religious view. The Establishment Clause would prohibit, for example, governmental endorsement of a particular version of the Decalogue as authoritative. Here the display of the Ten Commandments alongside eight secular documents, *895 and the plaque’s explanation for their inclusion, make clear that they were not posted to take sides in a theological dispute.

 The two exceptions are the March 23, 1798, proclamation of John Adams, which asks God “freely to remit all our offenses” “through the Redeemer of the World,” http://www.pilgrimhall.org/ThanxProcl789.htm, and the November 17,1972, proclamation of Richard Nixon, which stated, “From Moses at the Red Sea to Jesus preparing to feed the multitudes, the Scriptures summon us to words and deeds of gratitude, even before divine blessings are fully perceived,” Presidential Proclamation No. 4170, 37 Fed. Reg. 24647 (1972).

 Justice Stevens finds that Presidential inaugural and farewell speeches (which are the only speeches upon which I have relied) do not violate the Establishment Clause only because everyone knows that they express the personal religious views of the speaker, and not government policy. See Van Orden v. Perry, ante, at 723 (dissenting opinion). This is a peculiar stance for one who has voted that a student-led invocation at a high school football game and a rabbi-led invocation at a high school graduation did constitute the sort of governmental endorsement of religion that the Establishment Clause forbids. See Santa Fe Independent *898 School Dist. v. Doe, 530 U. S. 290 (2000); Lee v. Weisman, 505 U. S. 577 (1992).

 See Scalia, Originalism: The Lesser Evil, 57 Cincinnati L. Rev. 849, 852-853 (1989).

 Nothing so clearly demonstrates the utter inconsistency of our Establishment Clause jurisprudence as Justice O’Connor’s stirring concurrence in the present case. “[W]e do not,” she says, “count heads before enforcing the First Amendment.” Ante, at 884. But Justice O’Connor joined the opinion of the Court in Marsh v. Chambers, 463 U. S. 783 (1983), which held legislative prayer to be “a tolerable acknowledgment of beliefs widely held among the people of this country.” Id., at 792.

 The Court’s reflexive, skepticism of the government’s asserted secular purposes is flatly inconsistent with the deferential approach taken by our previous Establishment Clause cases. We have repeated many times that, where a court undertakes the sensitive task of reviewing a government’s asserted purpose, it must take the government at its word absent compelling evidence to the contrary. See, e. g., Edwards v. Aguillard, 482 U. S. 578, 586 (1987) (stating that “the Court is ... deferential to a State’s articulation of a secular purpose,” unless that purpose is insincere or a sham); Mueller v. Allen, 463 U. S. 388, 394-395 (1983) (ascribing the Court’s disinclination to invalidate government practices under Lemon’s purpose prong to its “reluctance to attribute unconstitutional motives to the States, particularly when a plausible secular purpose for the State’s *903 program may be discerned from the face of the statute”); see also Wallace v. Jaffree, 472 U. S. 38, 74 (1985) (O’Connor, J., concurring in judgment) (“[T]he inquiry into the purpose of the legislature... should be deferential and limited”).

 The Court’s only response is that the inclusion of the Ten Commandments in a display about the foundations of American law reflects “a purpose to [call on] citizens to act in prescribed ways as a personal response to divine authority,” in a way that legislative prayer and the inclusion of a créche in a holiday display do not. See ante, at 878, n. 24. That might be true if the Commandments were displayed by themselves in a church, or even in someone’s home. It seems to me patently untrue— given the Decalogue’s “undeniable historical meaning” as a symbol of the religious foundations of law, see Van Orden, ante, at 690 (plurality opin *906 ion) — when they are posted in a courthouse display of historical documents. The observer would no more think himself “called upon to act” in conformance with the Commandments than he would think himself called upon to think and act like William Bradford because of the courthouse posting of the Mayflower Compact — especially when he is told that the exhibit consists of documents that contributed to American law and government.

 The significant number of cases involving Ten Commandments displays in the last two years suggests the breadth of their appearance. See, e. g., Books v. Elkhart County, 401 F. 3d 857, 858-859 (CA7 2005) (Ten Commandments included in a display identical to the Foundations Display); Mercier v. Fraternal Order of Eagles, 395 F. 3d 693, 696 (CA7 2005) (Ten Commandments monument in city park since 1965); Modrovich v. Allegheny County, 385 F. 3d 397, 399 (CA3 2004) (Ten Commandments plaque, donated in 1918, on wall of Allegheny County Courthouse); Freethought Soc. of Greater Philadelphia v. Chester County, 334 F. 3d 247, 249 (CA3 2003) (Ten Commandments plaque, donated in 1920, on wall of Chester County Courthouse); King v. Richmond County, 331 F. 3d 1271, 1273-1274 (CA11 2003) (Ten Commandments depicted in county seal since 1872).

 Because there are interpretational differences between faiths and within faiths concerning the meaning and perhaps even the text of the Commandments, Justice Stevens maintains that any display of the text of the Ten Commandments is impermissible because it “invariably places the [government] at the center of a serious .sectarian dispute.” Van Orden, ante, at 718-719 (dissenting opinion). I think not. The sectarian dispute regarding text, if serious, is not widely known. I doubt that most religious adherents are even aware that there are competing versions with doctrinal consequences (I certainly was not). In any event, the context *910 of the display here could not conceivably cause the viewer to believe that the government was taking sides in a doctrinal controversy.

 Posted less than a month after respondents filed suit, the second displays included an excerpt from the Declaration of Independence, the Preamble to the Kentucky Constitution, a page from the Congressional Record declaring 1983 to be the Year of the Bible and the proclamation of President Reagan stating the same, a proclamation of President Lincoln designating April 30, 1863, as a National Day of Prayer and Humiliation, an excerpt from Lincoln’s “Reply to Loyal Colored People of Baltimore upon Presentation of a Bible” stating that “[t]he Bible is the best gift God has ever given to man,” and the Mayflower Compact. 96 F. Supp. 2d 679, 684 (ED Ky. 2000) (internal quotation marks omitted). The Counties erected the displays in accordance with a resolution passed by their legislative bodies, authorizing the County-Judge Executives “to read or post the Ten Commandments as the precedent legal code upon which the civil and criminal codes of the Commonwealth of Kentucky are founded,” and to display alongside the Ten Commandments copies of the documents listed above “without censorship because of any Christian or religious references in these writings, documents, and historical records.” Def. Exh. 1 in Memorandum in Support of Defendants’ Motion to Dismiss in Civ. Action No. 99-507, p. 1 (ED Ky.) (hereinafter Def. Exh. 1).

 Contrary to the Court’s suggestion, see ante, at 872, n. 20, it is clear that the resolutions were closely tied to the second displays, but not to the third. Each of the documents included in the second displays was authorized by the resolutions, and those displays, consistent with the resolutions’ direction to “post the Ten Commandments as the precedent legal code upon which the civil and criminal codes of the Commonwealth of Kentucky are founded,” Def. Exh. 1, supra, n. 13, at 1, consisted of a large copy of the Ten Commandments alongside much smaller framed copies of other historical, religious documents. The third displays, in contrast, *912 included documents not mentioned in the resolutions (the Magna Carta and a picture of Lady Justice) and did not include documents authorized by the resolutions (correspondence and proclamations of Abraham Lincoln and the Resolution of Congress declaring 1983 to be the Year of the Bible).
The resolutions also provided that they were to be posted beside the displays that they authorized. Id., at 9. Yet respondents have never suggested the resolutions were posted next to the third displays, and the record before the Court indicates that they were not. The photos included in the Appendix show that the third displays included 10 frames— the nine historical documents and the prefatory statement explaining the relevance of each of the documents. See App. to Pet. for Cert. 177a (Mc-Creary County), 178a (Pulaski County).